[No. S004437. Crim. No. 22511. Nov. 23, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM CHARLES PAYTON, Defendant and Appellant.

[No. S004437. Crim. No. 25552. Nov. 23, 1992.]

In re WILLIAM CHARLES PAYTON on Habeas Corpus.

## COUNSEL

Ellen Bailer Fondiler, Barry L. Levin, Stamp & Franklin and Joel Franklin for Defendant and Appellant and Petitioner.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Harley D. Mayfield, Assistant Attorney General, Frederick R. Millar, Jr., Jay M. Bloom, Holly D. Wilkens, John W. Carney and Esteban Hernandez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARABIAN, J.**—A jury convicted defendant of the 1980 first degree murder and rape of Pamela Montgomery, and the attempted murders of Patricia Pensinger and Patricia's son, Blaine Pensinger, all counts with the use of a butcher knife. (Pen. Code, §§ 187, 261, former subd. (2), 664, 12022, subd. (a).)[1] The jury also found true the special circumstance allegation that the murder was committed while engaged in the commission or attempted commission of rape. (§ 190.2, subd. (a) (17) (iii).) After a penalty trial, the jury imposed the death penalty. The court denied defendant's automatic motion to modify the verdict. (§ 190.4, subd. (e).) This appeal is automatic. (§ 1239.)

Defendant filed a separate petition for a writ of habeas corpus alleging that a psychological defense based upon his "combat experiences" in Vietnam should have been presented at trial. We issued an order to show cause, and consolidated the matter with the appeal. A referee presided over an evidentiary hearing, and has issued his report.

We affirm the judgment and deny the petition.

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

## I. THE APPEAL

### A. *The Facts*

#### 1. *Guilt Phase*

Patricia Pensinger lived in Garden Grove with her three sons, including 10-year-old Blaine, and some boarders. One boarder, Pamela Montgomery, had moved into the house two days earlier. She was living there while her husband was on duty with the National Guard. Defendant and his wife had also been boarders at one time.

Around 4 a.m., May 26, 1980, Patricia, unable to sleep, was sitting in her kitchen working on a crossword puzzle. She heard the front door open, and then saw defendant enter the kitchen. Defendant said that he had car problems and wanted to talk to Patricia. She offered him a beer, and the two talked for a while. At one point, Pamela Montgomery entered the kitchen briefly to get a glass of water. Patricia introduced defendant to Pamela. After Pamela left the kitchen, defendant and Patricia continued talking. Defendant drank a total of three beers. Eventually, around 4:50 a.m., defendant asked Patricia if he could sleep on her couch in the living room. She agreed, and then went to sleep in her bedroom. Blaine was also sleeping in her bed.

Patricia was awakened some time later by "two blows on [her] back." She rolled over in time to see defendant jump onto the bed on top of her. He stabbed her repeatedly with a knife, primarily on the face and neck. Blaine woke up, and tried to take the knife away from defendant, but defendant also stabbed him. Patricia yelled, "Take me, leave my son." Defendant tried to stab her in the abdomen, then tried a second and a third time to stab her; the knife blade had bent, and would not penetrate. Defendant got off the bed and left the room, yelling, "I'm leaving now."

Patricia told Blaine that she would try to keep defendant busy and that he should try to escape. She went into the kitchen, and saw defendant. The knife he had used was lying on the counter. Defendant reached for a second knife, and stabbed Patricia in the back. Blaine ran through the kitchen. As he ran past, defendant also stabbed him in the back. Defendant then resumed stabbing Patricia. Another son woke up by this time. Patricia yelled for her sons to awaken a male boarder. Defendant dropped the second knife on the kitchen floor, and fled the house through the front door.

Patricia suffered 40 stab wounds to her face, neck, back and chest. Blaine suffered 23 stab wounds to his face, neck and back. Both survived.

Not so fortunate was Pamela Montgomery. Her body, clad only in a nightgown that was open in the front, was found lying in a pool of blood on her bedroom floor. The body had 12 stab wounds, including 6 in a line from above the stomach to the pubic area. Three of the latter wounds alone would have been fatal. There were also some "defense wounds" sustained when the victim tried to defend herself. The victim had been dead about 15 to 30 minutes before the body was discovered.

Blood was found in various places in the bedroom and in a nearby bathroom. A pair of panties entwined around some shorts were found on the victim's bed. Saliva consistent with defendant's (and with that of a sizable portion of the general population) was found on the victim's breast. Semen that could have come from defendant was found in the victim's vaginal area. Defendant's fingerprint was found on a beer bottle in the kitchen.

After fleeing the Pensinger house, defendant went home, arriving around 6:15 a.m. Defendant's wife, Deborah Payton, waived the privilege not to testify against her husband, and testified that defendant's clothes, face, and hands were covered with blood. Some of the blood was still wet. His index finger was cut. When defendant removed his clothes, she observed that his genital area was covered with a "lot" of blood, as were his legs, chest and other parts of his body. His body contained scratches and what Deborah described as "fingernail digs," as if "somebody had applied quite a bit of pressure with fingernails."

Defendant and his wife left town that morning. Defendant was eventually arrested in Florida.

While in the Orange County jail, defendant told a fellow inmate about the crime. He said he raped and stabbed a woman, then stabbed a boy and the boy's mother. Defendant said he had "this urge to kill."

The defense presented no guilt phase evidence.

2. *Penalty Phase*

The prosecution presented evidence that in 1973, defendant stabbed a woman he was living with repeatedly in the chest and arm. A county jail inmate testified that defendant told him about the crimes committed in the Pensinger house. As a reason for the crimes, defendant said that he had a "severe problem with sex and women," and that he would "stab them and rape them." Defendant said "that all women on the street that he seen was a potential victim, regardless of age or looks."

The parties stipulated that defendant had suffered two prior felony convictions, both in 1976, one in Idaho for possession of over three ounces of marijuana, and one in Oregon for unlawful consensual sexual intercourse with a minor under the age of eighteen.

The defense presented evidence that defendant had become a religious person since his arrest and custody in jail. His mother testified that he was "totally immersed in the Lord." A minister who had known defendant for many years believed that his recent "commitment to the Lord" was sincere. A mission director testified about defendant's religious conversion and the good qualities he exhibited in jail. Defendant had established Bible study classes in jail, and had almost completed an autobiography that had an "excellent chance of being published in an international . . . Christian publishing house." Many jail inmates "respect him and trust him and have a confidence in him." He hoped to develop a "ministry within the prison system" that would rehabilitate people. A deputy sheriff testified that defendant led Bible study sessions in jail, and had a positive influence on other inmates. Four fellow inmates testified about defendant's beneficial influence in jail.

B. *Discussion*

1. *Guilt Phase*

(a) *Instruction Regarding Informant's Testimony*

Defendant contends the trial court erred by failing to instruct on its own motion that the testimony of a jailhouse informant should be viewed with suspicion and distrust, and that such testimony is inherently unreliable. We have repeatedly rejected similar contentions. (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1209-1210 [275 Cal.Rptr. 729, 800 P.2d 1159], and cases cited therein.) Defendant was given full opportunity to explore in front of the jury any motive to cooperate or other bias on the·part of all the witnesses, including the jailhouse informant. The standard instructions on judging the credibility of witnesses adequately guided the jury's assessment of the jailmate's testimony. (*Ibid.*)[2]

Defendant also argues that the jury should not convict on the basis of uncorroborated testimony of informants. (Cf. § 1111 [accomplice testimony

---

[2]Section 1127a, subdivision (b), enacted long after the trial in this case, now requires the court to give a specified cautionary instruction upon request. (See *People* v. *Gonzalez, supra,* 51 Cal.3d at p. 1210, fn. 5.) Even if that statute had been in effect at the time of trial, it would not help defendant's position, for here there was no request.

must be corroborated].) Neither we nor the Legislature has created such a requirement, but we need not resolve the question here, for the informant's testimony formed but a small part of the overall strong evidence against defendant. (See *People* v. *Alcala* (1984) 36 Cal.3d 604, 624, fn. 10 [205 Cal.Rptr. 775, 685 P.2d 1126].)

### (b) *Instructions on Diminished Capacity*

Defendant contends the court's instructions on diminished capacity were insufficient.[3] As in *People* v. *Frierson* (1979) 25 Cal.3d 142, 155-157 [158 Cal.Rptr. 281, 599 P.2d 587], we disagree for three reasons: (1) there was insufficient evidence to warrant diminished capacity instructions at all, (2) the instructions the court did give were sufficient, and (3) any error was harmless given the actual verdicts.

■ Defendant relied solely on the following testimony of Patricia Pensinger to support the diminished capacity claim. Defendant drank three beers while they talked in the kitchen. Defendant "had a funny way of shuffling his feet when he walks when he gets overly tired or when he was drinking." He exhibited that symptom that night. Also his speech was "slower, more precise than what his normal speaking voice was." However, he had no trouble walking, and his speech was otherwise fine. He knew what he was talking about, and he could respond. At the time of the stabbing, his reflexes, coordination and balance seemed normal.

"This evidence does not amount to substantial evidence that defendant lacked the capacity to form the requisite mental states, when we compare this case with others in which we have dismissed evidence of diminished capacity as insubstantial." (*People* v. *Pensinger, supra,* 52 Cal.3d at p. 1241; see also the cases cited therein.) For example, in *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 762 [230 Cal.Rptr. 667, 726 P.2d 113], there was testimony that the defendant had been drinking and had "had 'a lot' " of cocaine, and that he was " 'under the influence' " in that he was " 'talkative and really hyper.' " We found that this "testimony lent only minimal and insubstantial support to appellant's theory of diminished capacity from intoxication and therefore was not sufficient to justify the requested instruction." (*Ibid.*)

The same is true here. There was no evidence that the three beers affected defendant's ability to think in any way. "[D]efendant presented no evidence

---

[3]After the instant crimes were committed, the Legislature abolished the defense of diminished capacity. (See *People* v. *Saille* (1991) 54 Cal.3d 1103 [2 Cal.Rptr.2d 364, 820 P.2d 588].) That legislation does not apply retroactively to this case. (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1241 [278 Cal.Rptr. 640, 805 P.2d 899] [that the name is the same as the victim-witness in this case is coincidental].)

whatever, expert or otherwise, regarding the intoxicating effect, if any, which his use of . . . [the beer] may have had upon his ability to form the necessary intent" to commit the crimes. (*People* v. *Frierson*, *supra*, 25 Cal.3d at p. 156.)

Defendant contends that because the trial court did give some instructions on diminished capacity, there must have been evidence to support the theory. We have previously rejected the contention. (*People* v. *Pensinger*, *supra*, 52 Cal.3d at p. 1242; *People* v. *Frierson*, *supra*, 25 Cal.3d at p. 157.)

█ Even if there had been sufficient evidence to warrant instructions on diminished capacity, the instructions given were adequate. The court gave modified versions of former CALJIC Nos. 3.35 ("Diminished Capacity to Form Specific Mental State"), 4.21 ("Voluntary Intoxication—When Relevant to Specific Intent"), 4.22 (1979 rev.) ("Voluntary Intoxication—Defined"), and 8.79 ("Diminished Capacity to Form Requisite Specific Intent to Commit Underlying Crime in Felony Murder").[4] Defendant also requested former CALJIC No. 8.77 ("Diminished Capacity—Ability to Premeditate, Deliberate, Harbor Malice, or Intend to Kill"). The court refused the request on the basis that the content was covered by CALJIC No. 3.35.

Defendant contends that because the court did not give CALJIC No. 8.77, the jury was "only instructed on the diminished capacity defense as it related to appellant's ability to form the specific intent for murder [citation] and his ability to form the specific intent to commit the underlying crime in the felony murder. [Citation.] The jury was never informed that they could also apply the diminished capacity evidence to appellant's ability to premeditate, deliberate or harbor malice." A review of the instructions given belies the contention.

The jury was told that it had to determine whether defendant's mental or physical condition "prevented him from forming the specific intent or mental state essential to constitute the crime or degree of the crime with which he is charged." The court fully instructed on all the necessary specific intents and mental states for all the offenses, including first degree murder. Thus, "the jurors were told in unequivocal language that intoxication could have prevented defendant from forming the requisite specific intent for *each* of the various crimes charged." (*People* v. *Frierson*, *supra*, 25 Cal.3d at p. 155, italics in the original.)

█ Finally, any error was harmless. The jury was instructed on two theories of first degree murder: premeditated and felony murder. Defendant

---

[4] All CALJIC citations are to the fourth edition.

does not deny that the court correctly instructed on diminished capacity as it related to the felony-murder rule. The jury found true the rape-murder special circumstance. It "thus necessarily found the killing was committed in the course of a rape or attempted rape," a theory upon which the jury was correctly instructed. (*People* v. *Kelly* (1992) 1 Cal.4th 495, 531 [3 Cal.Rptr.2d 677, 822 P.2d 385].) We thus can determine that the murder "verdict rested on at least one correct theory." (*Ibid.*)

### (c) *Validity of the Felony-murder Rule*

Defendant contends that the felony-murder rule is unsound and unconstitutional. We have rejected the contention. (*People* v. *Silbertson* (1985) 41 Cal.3d 296, 303 [221 Cal.Rptr. 152, 709 P.2d 1321]; *People* v. *Dillon* (1983) 34 Cal.3d 441, 472-476 [194 Cal.Rptr. 390, 668 P.2d 697].)

### (d) *Special Circumstance Contentions*

Defendant contends that felony-based special circumstances, such as the rape-murder special circumstance of this case, are unconstitutional. They are not. (*Tison* v. *Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127, 107 S.Ct. 1676]; *Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716-717, 106 S.Ct. 689]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1140-1147 [240 Cal.Rptr. 585, 742 P.2d 1306].)

Defendant also contends the court erred in failing to instruct the jury on the requirement of an intent to kill. (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].) However, an intent to kill is no longer an element of a felony-based special circumstance if the defendant is the actual killer. (*People* v. *Anderson, supra,* 43 Cal.3d at pp. 1147-1148, overruling *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131.) "In this case, there is no issue of accomplice liability; the jury necessarily found that defendant was the actual killer." (*People* v. *Johnson* (1988) 47 Cal.3d 576, 602 [253 Cal.Rptr. 710, 764 P.2d 1087].) Accordingly, there was no requirement of an intent to kill. (*People* v. *Poggi* (1988) 45 Cal.3d 306, 326 [246 Cal.Rptr. 886, 753 P.2d 1082].) Contrary to defendant's contentions, the *Anderson* rule applies to this pre-*Carlos* crime. (*Poggi, supra,* at pp. 326-327.)

### 2. *Penalty Phase*

### (a) *Jury Selection*

Defendant contends the court erred in excusing for cause two prospective jurors because of their views on the death penalty. It is settled that

the trial court may excuse prospective jurors for cause if those jurors' views on the death penalty would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and their oath. (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]; *People* v. *Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809 P.2d 865].) "On appeal, if the prospective juror's responses are equivocal, i.e., capable of multiple inferences, or conflicting, the trial court's determination of that juror's state of mind is binding." (*Cooper, supra,* at p. 809.)

The record supports the trial court's rulings. The first juror said, "I think I would always vote for life imprisonment." She agreed that there was "no way" she could recommend the death penalty. The second juror said he would "automatically" vote for life. Defense counsel got him to say that he could vote for death "in the most aggravated case you can imagine." But his state of mind would make it "very difficult" for him to be fair to the state at a penalty phase. He later said that he did not think he could vote for death. These responses support the court's removal of these jurors. (*People* v. *Cooper, supra,* 53 Cal.3d at pp. 808-810.)

(b) *Issues Involving Informant Testimony*

Defendant contends the penalty phase testimony of the jailhouse informant regarding defendant's statements about stabbing and raping women, and about all women being potential victims, was improperly admitted. He claims use of uncorroborated informant testimony unconstitutionally undermines the reliability of the penalty determination. We have already rejected this contention. (*People* v. *Pensinger, supra,* 52 Cal.3d at p. 1250, fn. 13.) In addition, the independent evidence of defendant's crimes corroborated the informant's testimony. (*People* v. *Alcala, supra,* 36 Cal.3d at p. 624, fn. 10.)

■ Defendant also contends the court should have excluded the evidence under Evidence Code section 352, and that it was impermissible evidence of future dangerousness. We find, however, no abuse of discretion in admitting the evidence. (*People* v. *Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468].) Evidence of statements from defendant's own mouth demonstrating his attitude toward his victims was highly probative. Contrary to defendant's argument, the record shows that the court properly weighed the probative value against the prejudicial effect. Although we have generally condemned *expert* predictions of the defendant's future dangerousness because of their inherent unreliability (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 774 [175 Cal Rptr. 738, 631 P.2d 446]; see *People* v. *Daniels* (1991) 52 Cal.3d 815, 882 [277 Cal.Rptr. 122, 802 P.2d 906]), we have

consistently upheld prosecution argument of future dangerousness based on the evidence. (*People* v. *Bell* (1989) 49 Cal.3d 502, 549 [262 Cal.Rptr. 1, 778 P.2d 129]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 288 [221 Cal.Rptr. 794, 710 P.2d 861].) The evidence was properly admitted.

■ Defendant finally contends the court had a sua sponte duty to instruct the jury that evidence of his oral admissions should be viewed with caution. We reject the contention for two reasons. First, the instruction *was* given at the guilt phase; at the penalty phase, the court told the jury that it would be given the guilt phase instructions "to use if applicable in the penalty phase . . . ." This sufficed even if the instruction had been required. (*People* v. *Cooper, supra,* 53 Cal.3d at p. 846.) Second, there is no sua sponte duty to give the instruction at the penalty phase. (*People* v. *Livaditis* (1992) 2 Cal.4th 759, 782-784 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

### (c) *Cross-examination of Defense Witnesses*

Defendant contends the court erred in allowing the prosecutor to ask some of the defense witnesses questions regarding defendant's activities in jail. The questions received some negative responses and some positive responses. Since the record reflects a good faith basis for the questions, and they were relevant to impeach the defense testimony, we find no error.

#### (i) *Factual Background*

Phillip Arellano, a fellow jail inmate of defendant, testified about defendant's religious faith and "very good influence" on other inmates. At the end of the direct examination, the district attorney sought permission to ask on cross-examination if the witness had observed defendant gambling and extracting money from other prisoners in return for things such as telephone privileges. The questions would be based on information supplied by the two jail informants who had testified previously. The prosecutor did not want to call those witnesses again on rebuttal, but stated he would if necessary. When defendant objected to the questions, a hearing was held outside the presence of the jury.

Arellano testified at the hearing that he had seen defendant gambling but had not seen him extracting money from other prisoners. Defendant withdrew his objection to questions about gambling, but reiterated it regarding extracting money. The court overruled the objection on the basis that the "answers are in the negative." In front of the jury, Arellano repeated that he had seen defendant gamble, but had not seen him extracting money. The district attorney later asked another fellow inmate testifying for the defense the same questions; each question elicited a negative response.

Upon a further defense objection, the court indicated it was allowing the questions because the district attorney stated he had a factual basis for the questions, and that they "would go to the bias and prejudice" of the witnesses. The district attorney reiterated that the questions were based on "information from at least two witnesses." He had not yet decided whether he was going to call those two witnesses on rebuttal. The court then stated that a new hearing should be held if the district attorney intended to ask future witnesses similar questions.

Another hearing was held outside the presence of the jury prior to the testimony of the next defense witness. The prosecutor stated that, if the witness also testified about defendant's religious beliefs, he wanted to ask the questions about defendant's gambling and extracting money, and also about whether defendant had engaged in mutual combat in jail and had planned an escape. The court ruled that the probative value of the latter questions was outweighed by the prejudicial effect, and it excluded them. It also ruled that it would not allow the questions about gambling and extracting money unless the district attorney presented in rebuttal the witnesses who supplied the information. Otherwise, the court was concerned that "if we keep asking the questions in the negative, we're getting into an area which will create a problem unless we have some rebuttal witnesses." The district attorney responded that he was not sure if the rebuttal evidence was important enough to present. When the next witness indicated he would give negative answers to all the questions, the court disallowed them under Evidence Code section 352.

The court later stated that if the defense elicited testimony that defendant was a "calming influence" on fellow inmates, it would allow questions concerning defendant engaging in mutual combat. In response to the ruling, defense counsel stated that he would not call a certain witness.

The next defense witness was Deputy Sheriff Engen. Engen testified that defendant was a positive influence on other inmates. On cross-examination, the district attorney asked if it had been brought to his attention that defendant "was extracting commissary from other prisoners for phone calls." The witness answered that "yes," one inmate had told him that. On redirect examination, Engen testified that defendant had the "ability to calm the other inmates." On recross-examination, the prosecutor asked if the witness was aware of defendant "ever engaging in mutual combat with other prisoners while you were on duty . . . ." He responded, "No, not while I was on duty."

The next day, a juror sent the court a note stating, "The prosecution mentioned extracting money for phone calls. Please ask him to explain what

that means." Defendant moved to "strike that part of the testimony" and to prohibit the prosecutor from arguing it; he also asked that the jury "request not be answered." The court denied the request to strike the testimony, but "in an abundance of caution" instructed the prosecutor not to comment on it in argument. The court did not respond to the juror's note.

(ii) *Analysis*

Defendant contends the court erroneously allowed the questions of the two inmate witnesses regarding gambling and extracting money (eliciting one positive response from one witness regarding gambling; the rest of the responses were negative), and the questions of the deputy sheriff regarding extracting money (eliciting a positive response) and mutual combat (eliciting a negative response). He also contends the court should have responded to the jury note. We discuss his several arguments in order.

■ Defendant first contends the evidence did not come within one of the aggravating factors of section 190.3. The evidence, however, was not introduced in aggravation but to impeach the defense evidence. "We have previously observed that such impeachment is permissible when character evidence is introduced at the penalty phase. As we observed in *People* v. *Siripongs* (1988) 45 Cal.3d 548 [247 Cal.Rptr. 729, 754 P.2d 1306]: 'It is well established that, "[w]hen a defense witness, other than the defendant himself, has testified to the reputation of the accused, the prosecution may inquire of the witness whether he has heard of acts or conduct by the defendant inconsistent with the witness' testimony." (*People* v. *Wagner* (1975) 13 Cal.3d 612, 619 [119 Cal.Rptr. 457, 532 P.2d 105].) So long as the People have a good faith belief that the acts or conduct about which they wish to inquire actually took place, they may so inquire.' (*Id.* at p. 578.) Thus, we 'reject[ed] defendant's claim that cross-examination under Evidence Code section 1102 is impermissible at the penalty phase whenever character testimony is introduced in mitigation rather than to show conformity with a particular character trait. A defendant has no right to mislead the jury through one-sided character testimony during either the guilt or penalty trial. We do not believe that defendant was entitled to elicit testimony suggesting that he was honest, and at the same time to preclude the People from introducing contrary evidence.' (*Ibid.*)" (*People* v. *Fierro* (1991) 1 Cal.4th 173, 239 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)

Similarly, the questions here were appropriate to impeach the testimony about defendant's religious conversion and calming influence in jail. Defendant claims the evidence was not introduced as rebuttal, citing the district attorney's uncertainty whether he would present the jailhouse informants as

rebuttal witnesses (he ultimately did not). However, the questions were clearly intended to impeach the defense witnesses, and were admitted for that purpose. It did not matter that they were asked on cross-examination during the defense portion of the trial rather than during the prosecution's rebuttal portion. (See *People* v. *Fierro, supra,* 1 Cal.4th at p. 239.)

Defendant next complains that he was not given advance notice of the evidence in violation of the notice requirement of section 190.3. Since he did not object on that basis at trial, the issue is not cognizable on appeal. (*People* v. *Cooper, supra,* 53 Cal.3d at p. 842; *People* v. *Carrera* (1989) 49 Cal.3d 291, 334 [261 Cal.Rptr. 348, 777 P.2d 121].) Moreover, no notice is required when the evidence is introduced to rebut defense mitigating evidence. (§ 190.3; *People* v. *Harris* (1981) 28 Cal.3d 935, 961 [171 Cal.Rptr. 679, 623 P.2d 240].)

Defendant contends the questions were not asked in good faith. The record does not support the contention. The district attorney stated the factual basis for the questions. Defendant did not claim there was no factual basis. He did not, quite reasonably, insist that the informants supplying the information actually testify on rebuttal. The positive responses that were elicited as to two of the questions also support the claim of good faith.

Defendant contends the questions of Deputy Engen violated a court order that they not be asked without a further in camera hearing. We disagree. At one point, the court did indicate a new hearing should be held before such questions were asked. Thereafter, a new hearing *was* held, and the court made further rulings. It did not indicate that yet another hearing would be required. The record is not clear whether the question regarding extracting money came within the rulings, although the question regarding mutual combat clearly was permitted. If defendant believed any question violated the court's ruling, he should have objected at that time. He did not. Upon an objection, a hearing could have been held. Since the witness gave a positive answer to the question about extracting money, the court undoubtedly would have allowed it. Indeed, when defendant did object the next day, the court refused to strike the testimony.

Defendant also contends that the *form* of the questions was improper. He claims that questions admissible under Evidence Code section 1102 must be prefaced by the words "have you heard." Defendant did not object on that basis; the issue is thus not cognizable on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 22 & fn. 8.) In any event, penalty phase cross-examination of defense witnesses in mitigation is not so restricted. (*People* v. *Fierro, supra,* 1 Cal.4th at p. 239.)

■ Finally, defendant contends the court was required to respond to the juror's note. Although the court must respond to jury questions during deliberations regarding "any point of law arising in the case" (§ 1138; see *People* v. *Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311]), the note had nothing to do with the law, but with a fact. The juror merely requested that the prosecutor be asked to explain what "extracting money for phone calls" means. Although defense counsel asked that the testimony be stricken, he also asked "for an order directing the prosecutor not to argue it and . . . that this request not be answered . . . ." Defendant obviously did not want the jury given a further explanation of this evidence. The court granted these defense requests, which effectively precluded any response to the note. The issue has thus been waived on appeal. (*People* v. *Thoi* (1989) 213 Cal.App.3d 689, 698 [261 Cal.Rptr. 789].) Given the nature of the note—a request of the prosecutor, not the court—we also find no error.

(d) *Contentions Regarding Other Crimes Evidence*

Defendant raises a number of contentions regarding the evidence of other crimes, most of which we have already rejected. Admission of prior unadjudicated crimes does not deny him due process or a reliable death judgment. (*People* v. *Medina* (1990) 51 Cal.3d 870, 906-907 [274 Cal.Rptr. 849, 799 P.2d 1282]; *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480].) The court is not required to instruct the jury that it could consider other crimes evidence only if it *unanimously* found such crimes had been proved beyond a reasonable doubt. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1273 [270 Cal.Rptr. 451, 792 P.2d 251].) The court is not required to enumerate the other crimes that the jury should consider or to instruct on the elements of those crimes. (*People* v. *Hardy* (1992) 2 Cal.4th 86, 205-207 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

The court told the jury at the penalty phase that it would be given the guilt phase instructions "in the jury room to use if applicable in the penalty phase of this trial." It also instructed, "As to evidence of other crimes committed by the defendant not charged in this case, such offenses before they can be considered must be proven to you beyond a reasonable doubt, as has previously been defined to you." The court refused defendant's request to repeat the entire reasonable doubt instructions. Such instructions were given at the guilt phase.

Defendant contends the court was required to repeat all of the reasonable doubt instructions at the penalty phase. We disagree. The specific reference to the guilt phase instructions, which were made available to the jury,

sufficed. (See *People* v. *Cooper*, *supra*, 53 Cal.3d at p. 846; *People* v. *Brown* (1988) 46 Cal.3d 432, 460 [250 Cal.Rptr. 604, 758 P.2d 1135].)

(e) *Instructions and Argument on Mitigating Evidence—Section 190.3, Factor (k)*

 Defendant contends that the trial court's instructions and the prosecutor's argument led the jurors to believe, incorrectly, that they were not permitted to consider defendant's mitigating evidence. Our review of the record does not support the contention.

As already mentioned, defendant's case in mitigation consisted of evidence to the effect that he had experienced a religious conversion in prison and had subsequently behaved well. To present this case defendant called eight witnesses, including his pastor, a deputy sheriff who testified that defendant had a calming effect on other prisoners, four inmates who testified to defendant's sincerity, including one who testified that defendant had persuaded him not to commit suicide, defendant's mother, and the director of a religious organization that ministered to prisoners.

At the close of the penalty phase the trial court instructed the jury in the language of section 190.3, factor (k) (hereafter, factor (k)). Thus, the jurors heard that they were to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." The trial court denied defense counsel's request to modify the instruction to refer specifically to "evidence of the defendant's character, background, history, mental condition and physical condition." Although the court agreed with counsel that factor (k) was a catch-all provision and permitted the jury to consider such evidence, the court expressed "reluctan[ce]" to "change a CALJIC instruction" that followed the statute "verbatim."

During closing argument, the prosecutor incorrectly argued that factor (k) referred to "some factor at the time of the offense that somehow operates to reduce the gravity for what the defendant did" but not "to anything after the fact or later." On appeal, defendant contends that the jurors probably accepted the prosecutor's interpretation of factor (k) and, thus, disregarded the extensive testimony about defendant's religious conversion.

In essence, defendant asserts the type of claim that we addressed in *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813]. In that case, which we decided two years after defendant's trial, we recommended that courts in the future adorn factor (k) with the explanatory gloss that juries are permitted to consider "any other 'aspect of defendant's character or

record . . . that the defendant proffers as a basis for a sentence less than death.' " (*Easley, supra,* 34 Cal.3d at p. 878, fn. 10.) Our recommendation was motivated by the argument that a jury instruction in the language of factor (k) would violate the federal Eighth Amendment if understood by the jury as barring consideration of character and background evidence. The Eighth Amendment, of course, requires that the sentencer be permitted to consider such evidence. (*Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110-112 [71 L.Ed.2d 1, 102 S.Ct. 869]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 602-609 [57 L.Ed.2d 973, 988-993, 98 S.Ct. 2954]; see also *Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4-9 [90 L.Ed.2d 1, 6-9, 106 S.Ct. 1669] [regarding good behavior in prison].)

 Since our decision in *Easley*, however, the United States Supreme Court has held that the language of factor (k) satisfies the federal Eighth Amendment. (*Boyde* v. *California* (1990) 494 U.S. 370, 372, 377-386 [108 L.Ed.2d 316, 324, 326-333, 110 S.Ct. 1190] (*Boyde*).) The court reasoned that factor (k) does not, as the petitioner in that case argued, "limit the jury's consideration to 'any other circumstance *of the crime* which extenuates the gravity of the crime.' " (*Boyde, supra,* 494 U.S. at p. 382 [108 L.Ed.2d at p. 330], italics in original.) Instead, the factor directs the jury "to consider *any other circumstance* that might excuse the crime, which certainly includes a defendant's background and character." (*Ibid.,* italics in original.) The high court found its conclusion to be reinforced by the other sentencing factors, which "allow for consideration of mitigating evidence not associated with the crime itself, such as the absence of prior criminal activity by a defendant, the absence of prior felony convictions, and youth. When factor (k) is viewed together with those instructions, it seems even more improbable that jurors would arrive at an interpretation that precludes consideration of all non-crime-related evidence." (*Id.,* at p. 383.)

To be sure, the high court's holding in *Boyde* does not prevent a defendant from asserting a claim to the effect that prosecutorial argument, or other factors, led the jury to misinterpret factor (k). (*Boyde, supra,* 494 U.S. at p. 384 [108 L.Ed.22d at pp. 331-332].) However, in evaluating such claims we do not treat comments by attorneys as if they had the same force as the trial court's instructions on the law. This is because "[t]he former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter . . . are viewed as definitive and binding statements of the law." (*Ibid.*)

Rather than creating a rule to the effect that incorrect remarks by attorneys about the permissible scope of mitigating evidence are presumed to have misled the jury, *Boyde* teaches that there is constitutional error only if it is

reasonably likely that such remarks led the jurors to understand the trial court's instructions as precluding consideration of relevant mitigating evidence offered by the defendant. (*Boyde, supra,* 494 U.S. at pp. 378-381, 386 [108 L.Ed.2d at pp. 327-330, 332-333].) *Boyde* also teaches that comments by attorneys "must be judged in the context in which they are made." (*Id.,* at p. 385 [108 L.Ed.2d at p. 332].) To the same effect, we have said that we will examine pre-*Easley* cases "on [their] own merits to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion . . . ." (*People* v. *Brown* (1985) 40 Cal.3d 512, 544, fn. 17 [220 Cal.Rptr. 637, 709 P.2d 440].) With regard to the standard of review in cases such as this, *Brown, supra,* 40 Cal.3d 512, and *Easley, supra,* 34 Cal.3d 858, should not be understood as requiring more or less than *Boyde, supra,* 494 U.S. 370.

Applying this analysis to the case before us, we do not consider it reasonably likely that the jurors believed the law required them to disregard defendant's mitigating evidence. Several considerations lead us to this conclusion.

It is true that the prosecutor during closing argument suggested a narrow and incorrect interpretation of factor (k). The factor, he told the jury, "says any other circumstance which extenuates or lessens the gravity of the crime. What does that mean? That to me means some . . . factor at the time of the offense that somehow operates to reduce the gravity for what the defendant did. [¶] It doesn't refer to anything after the fact or later. That's particularly important here because the only defense evidence you have heard has been about this new born Christianity." Any impact this argument may have had, however, was immediately blunted by defense counsel's objection, which led the court to remind the jury that lawyers' comments were "not evidence" but "argument," and "to be placed in [their] proper perspective." (Cf. *Boyde, supra,* 494 U.S. at p. 384 [108 L.Ed.2d at pp. 331-332] [recognizing that such comments "are likely viewed as the statements of advocates," especially when "billed in advance to the jury as matters of argument, not evidence"].)

Later in his closing argument, the prosecutor implicitly conceded the relevance of defendant's mitigating evidence by devoting substantial attention to it. The prosecutor also suggested, properly, how the jury might weigh defendant's evidence against the evidence in aggravation. To quote: "The law in its simplicity is that . . . if the aggravating factors outweigh the mitigating, the sentence the jury should vote for should be the death penalty. [¶] How do the factors line up? The circumstances and facts of the case, the defendant's other acts showing violence, Mrs. Pensinger and Mrs. Stone,

. . . Blaine Pensinger, the defendant's two prior convictions line up against really nothing except defendant's newborn Christianity and the fact that he's 28 years old. This is not close." Obviously, this exercise by the prosecutor had a point only if it was contemplated that the jury *would* consider defendant's evidence. (Cf. *People* v. *Mason* (1991) 52 Cal.3d 909, 965 [277 Cal.Rptr. 166, 802 P.2d 950], and *People* v. *Guzman* (1988) 45 Cal.3d 915, 957 [248 Cal.Rptr. 467, 755 P.2d 917] [in which the attention paid by prosecutors in closing argument to defense evidence was found to have undercut suggestions that such evidence was not mitigating under factor (k)].)

For the jury to have accepted a narrow view of factor (k) in this case would have meant disregarding all of defendant's mitigating evidence, since the testimony of his eight penalty phase witnesses was all directed to his religious conversion and consequent behavior in prison. Indeed, it would have meant disregarding virtually the entire penalty phase, since the testimony of the prosecution's two witnesses occupies only eleven pages of the transcript. We think it unlikely, however, as did the high court in *Boyde*, "that reasonable jurors would believe the court's instructions transformed all of [defendant's] 'favorable testimony into a virtual charade.' " (*Boyde*, *supra*, 494 U.S. at p. 383 [108 L.Ed.2d at p. 331].) The high court's observation is especially apt when the trial court, as here, has also instructed the jury to consider "all of the evidence which has been received during any part of the trial" in determining the penalty. (See *ibid.*)

Defense counsel, in his own closing argument, strongly reinforced the correct view that defendant's religious conversion was proper mitigating evidence. (Cf. *People* v. *Guzman*, *supra*, 45 Cal.3d at p. 957 [holding that a prosecutor's comments about factor (k) were cured by defense counsel's comments].) Responding to the prosecutor's earlier argument that factor (k) permitted the jury to consider crime-related evidence only, defense counsel presented the following, proper interpretation of the law: "section (k) may be awkwardly worded, but it does not preclude or exclude the kind of evidence that was presented. It's a catch-all phrase. It was designed to include, not exclude, that kind of evidence. [¶] Any jury . . . that was in the position of trying to determine the fairest possible sentences, select them between death or life without possibility of parole, would not only want that kind of evidence but would need it to make an intelligent decision." The court did not permit the prosecutor to argue in rebuttal.

On this record, it is not reasonably likely that the jury understood the court's instructions as precluding consideration of defendant's mitigating evidence. While the court did not embellish the language of factor (k), that

fact standing alone does not support a claim of error. (See *Boyde, supra*, 494 U.S. at p. 381 [108 L.Ed.2d at pp. 329-330]; *People* v. *Mason, supra*, 52 Cal.3d at p. 965.) Moreover, while the prosecutor's interpretation of factor (k) was clearly incorrect, any force it might have had was blunted by the court's instruction to consider "all of the evidence," the prosecutor's own discussion of defendant's mitigating evidence, and defense counsel's correct statement of the law. Accordingly, we find no instructional error.

Defendant has asked us to judicially notice the transcript of oral argument before the United States Supreme Court in *Boyde, supra*, 494 U.S. 370, in which, in response to questioning, the Attorney General said that the prosecutor in *this* case "misled the jurors." The dissent relies substantially on this "concession," and appears to argue that we should judicially notice the transcript. We disagree. We have examined the transcript of the oral argument in *Boyde*, and find nothing in it relevant to the proper resolution of *this* case. Even if a matter is a proper subject of judicial notice, it must still be *relevant*. (Evid. Code, § 350; *Mozzetti* v. *City of Brisbane* (1977) 67 Cal.App.3d 565, 578 [136 Cal.Rptr. 751].)

The meaning of the high court's opinion in *Boyde, supra*, 494 U.S. 370, must be gleaned from the opinion itself. Moreover, whatever critical remarks might have been made during oral argument in *Boyde* about the prosecutor's argument in the case before us were made without the benefit of a full examination of the record—an examination that the opinion in *Boyde* requires us to undertake before concluding that constitutional error has occurred. (*Boyde, supra*, 494 U.S. at p. 385 [108 L.Ed.2d at p. 332].) Contrary to the implication of the dissent, we are not ignoring the officially expressed views of the Attorney General. In *this* case, he is arguing vigorously, based upon the entire record, that the jury was not misled. It is our duty to decide the issue based on the arguments and record of *this* case, not comments taken out of context in a different case. (See *People* v. *Pinholster* (1992) 1 Cal.4th 865, 974-975 [4 Cal.Rptr.2d 765, 824 P.2d 571] [pretrial evaluation of a case by a supervising deputy district attorney irrelevant to our assessment of the prejudicial effect of any errors at trial].) We have performed this duty. The request to take judicial notice is therefore denied.

(f) *Other Instructional Contentions*

Defendant contends that the instructions impermissibly established a mandatory sentencing formula. The jury was instructed that, "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. [¶] However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall

impose a sentence of confinement in the state prison for life without the possibility of parole." In *People* v. *Brown, supra,* 40 Cal.3d 512, we upheld the instruction, but identified two interrelated ways in which it might potentially mislead the jury. First, the jury might believe it should merely count the aggravating and mitigating factors. Second, the jury might understand the instructions as allowing or requiring it to return a death verdict without deciding that that penalty was appropriate under the facts and circumstances of the particular case. (See *People* v. *Hayes* (1990) 52 Cal.3d 577, 642 [276 Cal.Rptr. 874, 802 P.2d 376].) To determine whether the jury may have been misled to defendant's prejudice in these regards, we have reviewed the entire record. (*Ibid.*)

In *Boyde, supra,* 494 U.S. at pages 376-377 [108 L.Ed.2d at pages 326-327], the high court upheld these same instructions against federal constitutional attack. Assuming "our traditional *Brown* analysis" is still necessary after *Boyde* (see *People* v. *Gonzalez, supra,* 51 Cal.3d at p. 1231, fn. 30), we find no legitimate basis for believing the jury was misled. Indeed, the district attorney expressly argued that the jury is "supposed to go through a weighing process of the factors," and that "if the aggravating factors outweigh the mitigating, the sentence the jury *should* vote for *should* be the death penalty." (Italics added.) The jury was not misled about its sentencing function. (See *id.* at pp. 1230-1231.)

Defendant reiterates other contentions which we have previously rejected. He claims that giving the "no sympathy" instruction at the guilt phase was error since the court referred to those instructions at the penalty phase. There was no error. (*People* v. *Sanders* (1990) 51 Cal.3d 471, 528 [273 Cal.Rptr. 537, 797 P.2d 561].) As discussed above, the jury was not misled regarding its obligation to consider all of the defense's mitigating evidence. (*People* v. *Gonzalez, supra,* 51 Cal.3d at pp. 1224-1226; *People* v. *Brown, supra,* 46 Cal.3d at p. 460.) Multiple use of the fact of rape (felony-murder rule, special circumstance, and aggravating circumstance) was proper. (*People* v. *Gates* (1987) 43 Cal.3d 1168, 1188-1190 [240 Cal.Rptr. 666, 743 P.2d 301].) The court need not clarify the section 190.3, factor (b), instruction to state that it refers to violent criminal conduct *other* than the crimes charged in this proceeding. (*People* v. *Sanders, supra,* 51 Cal.3d at p. 528.) Finally, the court was not required to instruct the jury that it could return a verdict of death only if it were persuaded beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances and that death was the appropriate penalty. (*People* v. *Marshall* (1990) 50 Cal.3d 907, 935-936 [269 Cal.Rptr. 269, 790 P.2d 676].)

(g) *Propriety of the Death Penalty*

Defendant contends the 1978 death penalty law is unconstitutional. It is not. (*People* v. *Fierro, supra,* 1 Cal.4th at p. 255.) Defendant contends we

must engage in a comparative sentence review to determine whether his sentence is disproportionate. We need not. (*People* v. *Cox* (1991) 53 Cal.3d 618, 690-691 [280 Cal.Rptr. 692, 809 P.2d 351].) Given the nature of defendant's crimes, the death sentence is not so disproportionate that it shocks the conscience and offends fundamental notions of human dignity. (*Id.* at p. 690.)

## II. HABEAS CORPUS

### A. *Factual Background*

Defendant filed a petition for a writ of habeas corpus, supported by various declarations, contending that his trial counsel was ineffective for not investigating and presenting evidence that he suffered from "Post-Traumatic Stress Disorder" (PTSD) because of his "combat experiences" in Vietnam.

The declaration of Dr. H. R. Kormos, a psychiatrist retained by the defense to examine defendant, recited the following factual claims by defendant. "Immediately after [defendant's] deplaning [in Vietnam], the airstrip came under fire . . . ." "Several times daily and sometimes also at night Mr. Payton went on helicopter missions. He flew Cobra gunships as well as HU-ID's, helicopter gunships. His unit encountered enemy activity routinely. It flew reconnaissance missions, searching for enemy locations and land mines, and backed infantry units with air strikes." Defendant's unit "often served as the point unit . . . , which required a single helicopter gunship to serve as a decoy so as to literally draw, and often receive, enemy fire in an attempt to flush out the Vietcong in order that U.S. troops could identify enemy locations and respond. For many of these helicopter crews these operations amounted to suicide missions.

"During Mr. Payton's second mission, the helicopter's hydraulic system was hit by bullets and the craft crashlanded, after spinning out of control at 1200 feet altitude. Thereafter the crew was pinned down by enemy fire for three hours. With great difficulty, they were finally rescued."

Defendant "remembers witnessing avoidable deaths: a doorgunner accidentally shooting three American soldiers; a sergeant on the flight line decapitated by a rotor blade." "After about six weeks in Vietnam, his helicopter was sent as the point ship on a night mission, with orders to try to rescue the crew of a ship downed earlier. While firing his machinegun, Mr. Payton saw enemy tracer bullets coming right at him and then he was knocked out by a round. He fully expected death, but when he came to, he discovered to his amazement that his flakjacket had stopped the bullet."

Dr. Kormos's declaration stated that "[t]his experience was extremely traumatic for" defendant. "[H]e himself was daily placed in a situation in which he was totally helpless: as a machinegunner in a helicopter, he was at the same time at the mercy of the enemy shooting at him while completely dependent on the skill and the judgment of the pilot and the co-pilot." These experiences led defendant to use drugs. Dr. Kormos believed that this "traumatization," i.e., "the sense of being out of control and of being dominated by the violence and brutality that constantly surrounded him, eventually overwhelmed him," and ultimately "shaped his behavior on the night of the homicide."

"While in Vietnam and helplessly exposed to enemy fire at the door of his helicopter, he could try to regain his mastery in only one way: by firing his machinegun and riddling any target he could hit. It was this same reflex which resulted in the rape-homicide and the attempted murders."

Dr. Kormos believed that defendant suffered from PTSD and, therefore, at the time of the crimes, "lacked substantial capacity to appreciate the wrongfulness of his conduct, and to conform his conduct to the requirements of the law. In addition, due to this mental disorder, his capacity to form specific intent to kill or commit attempted murder was diminished."

A declaration by Bob Mertz, a counselor for Vietnam veterans, contained similar descriptions of defendant's alleged combat experiences.

Based upon these and related allegations, we issued an order to show cause. In his return, the Attorney General questioned whether defendant had actually had these combat experiences. Defendant's denial to that return included another declaration by Dr. Kormos which reiterated his "opinion" that defendant "was indeed significantly involved in and exposed to combat activities during his stay in Vietnam." The declaration discussed the basis for this opinion at length, and reiterated the view that defendant suffered from PTSD.

We appointed the Honorable Robert E. Rickles, retired Justice of the Court of Appeal, Fourth Appellate District, Division Two, as our referee to take evidence and make specified findings of fact. After a lengthy evidentiary hearing, the referee issued his report.

He found that defendant's claims regarding his combat experiences were false. "The true facts were that Mr. Payton had never experienced combat and in particular had never experienced the instances described to Mr. Mertz and Dr. Kormos. Payton had arrived in Viet Nam on August 9, was in Casual

company until August 25, assigned to Camp Eagle from August 25 until September 13, evacuated back on September 13 for treatment as a drug abuser, and returned to Hawaii on September 25. Payton's total exposure to Viet Nam was approximately 22 days. During this 22 days he served as a helicopter mechanic." The referee found that defendant had lied to his appellate counsel, to Mertz, and to Dr. Kormos.

In a supplemental declaration filed shortly before the evidentiary hearing, Dr. Kormos stated that he had recently interviewed defendant two more times; defendant told him that he had not, in fact, had these combat experiences. These latest interviews, Dr. Kormos declared, "allowed me to appreciate even more than I had previously, how crucially significant his performance in the military and the question of his participation in combat in particular, had been to him. Likewise I was again impressed by the vital role his experiences in Vietnam had on him on the night he committed the crimes for which he is now facing the death penalty." Dr. Kormos concluded that the "fact that *certain details* of Mr. Payton's experiences in Vietnam are not what I initially believed them to be does not alter my opinion that Mr. Payton was suffering from this mental disorder at the time of the rape, murder and attempted murders, and, as a result of the disorder, lacked substantial capacity to appreciate the wrongfulness of his conduct, and to conform his conduct to the requirements of the law. In addition, due to his mental disorder, his capacity to form specific intent to kill or to commit attempted murder was diminished." (Italics added.)

The referee found that despite defendant's lies, evidence could have been presented that defendant suffered from PTSD, primarily the testimony of three experts retained after trial by the defense—Dr. Kormos, Dr. John P. Wilson, and Dr. Thomas Williams. The latter two believed that defendant suffered from PTSD disorder which, combined with other personality disorders, caused him to commit the crime while in a disassociative state.

The referee found that prior to trial, defense counsel "had reports from four psychiatrists[,] none of whom mentioned Payton was suffering from any psychiatric disorder." Defendant "did not mention any traumatic military experiences to any of the people who were trying to establish a possible psychological defense." Nevertheless, the referee found that trial counsel "at least should have investigated the defense of PTSD even though he might later have rejected that defense"; that counsel "should have presented evidence of PTSD at the penalty phase of the trial"; and that if defendant had "thought about such a defense he could have and would have lied to [trial counsel] just as he did" later.

The referee found, however, that counsel would not have been "incompetent by failing to produce evidence of a post-traumatic stress disorder at the

guilt trial"; the "evidence of PTSD was weak and almost totally unbelievable." Specifically, he found that "Dr. Kormos's testimony was not only illogical, it was totally without any credibility at all," and that the testimony of Drs. Wilson and Williams would also not have substantially strengthened the defense.

## B. *Discussion*

Defendant contends his trial counsel rendered ineffective assistance by failing to investigate or present evidence of PTSD. **(14)** Such a contention has two components. Defendant has the burden of proving both that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688, 693-694 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052]; *In re Marquez* (1992) 1 Cal.4th 584, 602-603 [3 Cal.Rptr.2d 727, 822 P.2d 435].) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at p. 698]; accord, *In re Marquez, supra,* 1 Cal.4th at p. 603.)

The referee's findings of fact, though not binding on this court, are given great weight when supported by the record. His legal conclusions and resolutions of mixed questions of law and fact, such as whether counsel's performance was inadequate and whether such inadequacy prejudiced the defense, are subject to independent review. (*In re Marquez, supra,* 1 Cal.4th at p. 603.)

We disagree with the referee's finding that counsel was deficient in not investigating and presenting (at the penalty phase) the defense of PTSD. As the referee found, *none* of the four psychiatric reports indicated that defendant was suffering from that disorder. "Competent representation does not demand that counsel seek repetitive examinations of the defendant until an expert is found who will offer a supportive opinion." (*People* v. *Williams* (1988) 44 Cal.3d 883, 945 [245 Cal.Rptr. 336, 751 P.2d 395]; accord *In re Fields* (1990) 51 Cal.3d 1063, 1075 [275 Cal.Rptr. 384, 800 P.2d 862] ["When three experts concur in a diagnosis, competent counsel might reasonably believe it pointless to search further in the hope of finding an expert who would offer a different diagnosis, or facts that would support such a view."].)

Furthermore, defendant did not invent his combat experiences until *after* he had been convicted, and there was no other evidence of combat experience. Despite later defense attempts to downplay the significance of actual

combat (after discovery that the claims were false), such combat was the original underpinning of the alleged defense, and was what made it appear plausible. There was no evidence to alert defense counsel to a need to explore the defense. Since counsel was not required to investigate the defense, he was also not required to present the evidence.

Defendant has also not proven prejudice even if we assume counsel should have presented evidence of the kind presented at the posttrial evidentiary hearing. As the referee found, evidence of PTSD was weak and incredible. If the evidence had been presented at either the guilt or penalty phase, the jury would undoubtedly have given it little weight once it learned that the primary basis for the initial diagnosis—the vivid and compelling descriptions of defendant's alleged combat experiences in Vietnam—was sheer invention. While Dr. Kormos may have believed, as he stated in his supplemental declaration, that the alleged combat experiences were merely "certain details of Mr. Payton's experiences in Vietnam," no reasonable jury would have so considered them. At the penalty phase, evidence that defendant had lied about his combat experiences would have severely damaged the credibility of the jailhouse redemption defense that counsel *did* present. The failure to present this defense does not undermine confidence in the guilt or penalty verdict.

### DISPOSITION

The judgment is affirmed. The petition for a writ of habeas corpus is denied on the merits.

Lucas, C. J., Panelli, J. Baxter, J., and George, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—Two years ago, in oral argument before the nation's highest court in *Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190] (*Boyde*), the California Attorney General conceded that in the case now before us the prosecutor in his closing summation "misled the jurors" by arguing that the jury could not consider evidence, presented at the penalty phase of this capital case, that defendant had experienced a religious awakening.[1] Now, the Attorney General argues the contrary. The majority is persuaded by his argument. I am not.

In my view, there is a reasonable likelihood that the prosecutor's closing argument, which misconstrued an ambiguous instruction by the trial court, misled the jury into believing that it could not consider any of the evidence defendant had offered at the penalty phase. When defendant objected to the

---

[1]The pertinent details are discussed in footnote 2, *post.*

improper argument, the trial court neither condemned nor corrected the prosecutor's misstatement of legal principles. As a result, the jury was erroneously permitted to infer that the prosecutor's interpretation of the law was sound. The error requires reversal of the judgment of death against defendant.

## I.

At the penalty phase of this capital trial, defendant called eight witnesses. They testified that in the 17 months since his arrest defendant had become a "born again" Christian, causing him to fundamentally alter his outlook and behavior.

Deputy Sheriff Vincent Engen, who was in charge of defendant's module at the Orange County jail, testified that defendant held Bible-study sessions with the other inmates lasting from one to three hours, that he appeared to have a leadership role with the other inmates, and that his influence had been "positive." Deputy Engen was "glad" defendant was in the module "[b]e-cause of his ability to calm the other inmates."

Pastor John Kirk, who had known defendant for 10 years, visited defendant at the jail approximately 7 times. He observed "a great remorse and regret in [defendant] for . . . the things that he had done," and believed that defendant was "sincere in his . . . commitment to the Lord." Those views were shared by Barbara Seglie, the missions director for the Eagles Nest Christian Fellowship. At defendant's request, Seglie held approximately fifteen Bible-study sessions with defendant at the county jail, lasting from two to five hours. She testified that defendant's religious conversion "defi-nitely has changed his life." When she first met defendant, his comments reflected an interest only in his own needs, but in later sessions he began to show a concern for other inmates, and eventually inmates came to defendant for counseling.

Four county jail inmates—Phillip Arellano, Dennis Howie, Keith Dandley, and Bruno Palko—testified that defendant's religious conversion was sin-cere. Dandley and Palko described defendant as having a "positive" and "calming" influence on the other inmates. Dandley also credited defendant with saving his life by talking him out of committing suicide.

Defendant's mother, too, testified that her son's religious awakening was genuine, and that he had become a changed man since his arrest. She visited her son regularly in jail, and described him as being "totally immersed in the Lord."

Defendant asked the trial court to instruct the jury that it could consider in mitigation "evidence of the defendant's character, background, history, mental condition and physical condition." The prosecutor objected. Although the court agreed with defendant that the jury was entitled to consider such evidence in mitigation, it refused to modify the standard instruction (former CALJIC No. 8.84.1). That instruction, echoing the requirements of Penal Code section 190.3, told the jury it should base its penalty determination on certain specified factors. The only one of those factors to which defendant's mitigating evidence could possibly apply was that described in Penal Code section 190.3, factor (k) (factor (k)): "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

In closing argument, the prosecutor argued to the jury that the evidence presented by defendant at the penalty phase could not be considered under factor (k), because that factor "doesn't refer to anything after the fact," that is, after commission of the murder. (As the Attorney General now concedes, the prosecutor's characterization of the scope of factor (k) was incorrect.) Defense counsel asked to approach the bench, and, out of the hearing of the jury, objected that the prosecutor's argument was "completely contrary to what . . . [factor] 'k' was designed to apply to." The trial court overruled the objection, deciding that defendant and the prosecutor could each argue *to the jury* their differing interpretations of the scope of factor (k). The court then told the jury that the comments of the prosecutor and defense counsel were "not evidence" and were "to be placed in [their] proper perspective."

Thus authorized by the trial court to argue his misinterpretation of factor (k), the prosecutor told the jury several times that it could not legally consider defendant's mitigating evidence: "[Y]ou have not heard during the past few days any legal evidence [in] mitigation. . . . [¶] You have not heard any evidence of mitigation in this trial." Although the prosecutor also argued to the jury that even if defendant's evidence could be considered, it was of little value, he prefaced this argument by saying, "I don't really want to spend too much time on it because . . . I don't think [defendant's evidence] comes under any of the eleven factors . . . ."

## II.

Under the Eighth Amendment to the United States Constitution, a sentencing jury in a capital case must be permitted to "consider and give effect to all relevant mitigating evidence" offered by the defendant. (*Boyde, supra,* 494 U.S. at pp. 377-378 [108 L.Ed.2d at pp. 326-328]; see also *Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 6-7, 106 S.Ct. 1669]; *Eddings*

v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 988-993, 98 S.Ct. 2954] (plur. opn. of Burger, C. J.).) In California, the jury's consideration of mitigating evidence is limited by Penal Code section 190.3, which sets forth the aggravating and mitigating factors a jury may consider in deciding whether to return a judgment of death. In *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813] (*Easley*) and cases following it, we recognized that former CALJIC No. 8.84.1, which was given here and which describes to the jury the factors it may consider under section 190.3, is "potentially confusing." We expressed concern that a jury might construe the "factor (k)" portion of the instruction "to permit consideration only of circumstances that relate to the 'gravity *of the crime*' and not of circumstances that relate to the general character, family background or other aspects *of the defendant.*" (At p. 878.) Such a construction, we held, would violate the Eighth Amendment by impermissibly restricting the jury's consideration of mitigating evidence.

To avoid misunderstandings in future cases, our opinion in *Easley, supra,* 34 Cal.3d at page 878, footnote 10, set forth a more expansive "factor (k)" instruction. Thereafter, when reviewing "pre-*Easley*" cases in which the trial court instructed the jury in the language of former CALJIC No. 8.84.1, we have examined the entire record—including all of the jury instructions and the closing arguments of counsel—to determine whether the jury was indeed misled by the instruction. (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 146 [249 Cal.Rptr. 320, 756 P.2d 1348]; *People* v. *Brown* (1985) 40 Cal.3d 512, 544, fn. 17 [220 Cal.Rptr. 637, 709 P.2d 440].)

A similar analysis was employed by the United States Supreme Court in *Boyde, supra,* 494 U.S. 370. There, as in *Easley, supra,* 34 Cal.3d 858, the defendant challenged former CALJIC No. 8.84.1, contending that it misled the jury into believing it could not consider all of the evidence presented by the defense. The high court held that to determine whether a jury was misled by an assertedly ambiguous instruction such as former CALJIC No. 8.84.1, a reviewing court must decide "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." (494 U.S. at p. 380 [108 L.Ed.2d at p. 329].) Under the circumstances of that case, the *Boyde* court concluded, there was no reasonable likelihood that the jury had misapplied former CALJIC No. 8.84.1.[2]

The majority relies heavily on *Boyde, supra,* 494 U.S. 370, to conclude that the jury in this case did not misapply former CALJIC No. 8.84.1. This reliance is unfounded.

---

[2]The Attorney General's concession I mentioned at the outset of my opinion occurred during oral argument before the high court in *Boyde, supra,* 494 U.S. 370. According to a brief filed by the Attorney General in this case, the circumstances surrounding the concession

One of the important factors cited by the high court in *Boyde, supra,* 494 U.S. 370, in support of its holding that the jury in that case was not misled, was the type of evidence presented in mitigation. There, the defense presented evidence of the defendant's disadvantaged background and his strength of character in coping with a difficult childhood. The jury was instructed, in the language of former CALJIC No. 8.84.1, that it could consider " '[a]ny . . . circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime,' " and was told that the term " 'extenuate' " meant " 'to lessen the seriousness of a crime as by giving an excuse.' " (*Boyde, supra,* 494 U.S. at p. 381 [108 L.Ed.2d at p. 330].) Unless otherwise misled, the high court held, a jury was likely to conclude from these instructions that it could consider evidence of the defendant's disadvantaged background and his character strengths as a possible "excuse" for the seriousness of the crime. In other words, the jury was likely to reason that " ' "defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, *may be less culpable than defendants who have no such excuse.*" ' " (*Id.* at p. 382 [108 L.Ed.2d at p. 330], italics in original, quoting *Penry* v. *Lynaugh* (1989) 492 U.S. 302, 319 [106 L.Ed.2d 256, 278, 109 S.Ct. 2934].)

Here, by contrast, the mitigating evidence defendant presented was of a very different nature. Defendant relied on evidence of his behavior *after*

were as follows: An amicus curiae brief filed on behalf of Boyde attempted to demonstrate the possibility that a jury could misread the scope of former CALJIC No. 8.84.1, by showing that in several cases the prosecutor had misread it. As supporting evidence, the amicus curiae brief in *Boyde* contained partial transcripts of other capital trials, including an excerpt from the prosecutor's closing argument in this particular case. After the defense attorney arguing *Boyde* before the United States Supreme Court made specific reference to that closing argument, one of the justices then asked the deputy attorney general arguing the case to respond. In the course of his argument, the deputy attorney general conceded that in this case the prosecutor's closing argument misled the jury.

In a footnote to its opinion in *Boyde,* the United States Supreme Court rejected amicus curiae's assertion that misinterpretation of former CALJIC No. 8.84.1 by prosecutors arguing to the jury in other cases showed that the jury in *Boyde* might have been confused. The court concluded that because prosecutors are "interested advocates," their arguments are not reflective of the likely conclusions of "reasonable jurors." (*Boyde, supra,* 494 U.S. at p. 386, fn. 6 [108 L.Ed.2d at p. 332].)

In this case, defendant has requested that we take judicial notice of the oral argument before the United States Supreme Court in *Boyde.* In his response, the Attorney General does not deny the concession in issue, but correctly points out that he is not bound by it.

The majority denies the request for judicial notice, concluding that the high court's opinion in *Boyde* speaks for itself, and that the deputy attorney general's comments at oral argument before that court in *Boyde* are irrelevant to a proper resolution of this case. (Maj. opn., *ante,* p. 1073.) But this court has always considered the officially expressed views of the Attorney General, the state's chief law enforcement officer; and the Attorney General's opinions are frequently cited as legal authority by courts and parties alike. We should not ignore the Attorney General's views when, as in this case, they are expressed in oral argument before the nation's highest court.

commission of the crime, arguing in essence that *despite* the gravity of the crime he committed, he was nevertheless "worth saving." Unlike evidence of a disadvantaged background, that evidence does not fit neatly, if it fits at all, into factor (k), because it is not an "excuse" for the commission of the crime. Thus, the jurors in this case were more likely to be misled when they attempted to apply former CALJIC No. 8.84.1 than were the jurors who evaluated the "disadvantaged background" evidence presented by the defendant in *Boyde*.

More important than the type of mitigating evidence offered in this case, however, was the prosecutor's closing argument. Here, unlike *Boyde, supra,* 494 U.S. 370, *Easley, supra,* 34 Cal.3d 858, or any other case we have had before us, the prosecutor repeatedly argued to the jury that it legally could not consider any of the mitigating evidence presented by the defense. Despite defense counsel's objection, this argument was not corrected by the trial court, which ruled that the prosecutor and defense counsel could present *to the jury* their opposing interpretations of the scope of factor (k).

The trial court's ruling was wrong. The proper scope of factor (k) is a question of *law*, not of fact. It is the trial court's duty to explain the law to the jury, not to place upon the jury the impossible burden of deciding which of two inconsistent views of the law is correct. The jurors in this case were laypersons; presumably they were unfamiliar with the legislative history of factor (k) or with cases interpreting the Eighth Amendment. Thus, they were totally unequipped to decide whether the prosecutor or defense counsel had correctly explained to them which evidence they were entitled to consider in deciding whether defendant should live or die. (See *Griffin* v. *United States* (1991) 502 U.S. __, __ [116 L.Ed.2d 371, 382-383, 112 S.Ct. 466, 474]: "Jurors are not generally equipped to determine whether a particular theory . . . submitted to them is contrary to law . . . . When . . . jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.")

Nonetheless, the majority confidently finds no reasonable likelihood that the jury erred in discharging the impossible burden placed upon it. The reasons for the majority's conclusion do not withstand scrutiny.

The majority asserts that the prosecutor's argument was "blunted" by the trial court's remarks following defense counsel's objection. (Maj. opn., *ante,* p. 1071.) Not so. The trial court overruled that objection, permitting the prosecutor to repeat the improper argument. Although the trial court told the jury that the arguments of counsel were "not evidence," this admonition did

not assist the jury in evaluating the legal soundness of the prosecutor's argument.

According to the majority, the prosecutor "implicitly conceded" that defendant's mitigating evidence was relevant, by devoting "substantial attention" to it. (Maj. opn., *ante*, p. 1071.) But the prosecutor made no such concession. True, he did discuss defendant's evidence, but he prefaced his remarks by reminding the jury that the evidence was not "applicable." In essence, the prosecution asserted that even if the evidence of defendant's Christian conversion was relevant, it did not outweigh the aggravating circumstances in this case. At no time did the prosecutor acknowledge, explicitly or implicitly, that the jury could legally consider defendant's mitigating evidence.

The majority asserts that the jury must have believed that it could consider defendant's mitigating evidence, because to conclude otherwise would transform defendant's favorable penalty phase evidence into a " ' "charade." ' " (Maj. opn., *ante*, p. 1072.) Although this argument was persuasive in *Boyde*, *supra*, 494 U.S. at page 383 [108 L.Ed.2d at page 331], it is far less convincing under the facts of this case. In *Boyde*, faced only with an ambiguous instruction, the jury was unlikely to believe that the instruction required it to disregard the defense's entire penalty presentation. Here, however, the jury was confronted not only with an ambiguous instruction, but with an explicit argument by the prosecutor that it should ignore the mitigating testimony offered by the defense. Any reluctance by the jury to believe that the defense had presented a "charade" may well have vanished in the face of this persuasive argument.

The majority maintains that the jurors must have considered defendant's evidence of a Christian conversion, because they were told to consider " 'all of the evidence which has been received during any part of the trial . . . .' " (Maj. opn., *ante*, p. 1072.) The majority, however, omits the conclusion to the instruction, which told the jury it could consider "all of the evidence which has been received during any part of the trial in this case, *except as you may be hereafter instructed*." (Italics added.) The jury may have believed that the instruction which immediately followed, former CALJIC No. 8.84.1, was the exception referred to by the italicized words quoted above, and that former CALJIC No. 8.84.1 limited the jury's ability to consider the evidence presented by defendant.

An additional instruction also suggested to the jury that it should disregard the mitigating evidence presented by the defense. The court instructed the jury: "After having heard all of the evidence *and after having heard and*

*considered the argument of counsel,* you shall consider, take into account *and be guided by the applicable factors of aggravating and mitigating circumstances* upon which you have been instructed." (Italics added.) The court's statement to the jury that its consideration of "all of the evidence" should be guided by "the arguments of counsel" and "the applicable factors of aggravating and mitigating circumstances," was tantamount to an instruction to the jury that its power to consider the evidence was not unlimited. This instruction could only strengthen the prosecutor's erroneous and repeated argument to the jury that it could not legally consider defendant's mitigating evidence, and the jury may well have acted accordingly.

In the majority's view, defense counsel's closing argument accurately explained to the jury the meaning of former CALJIC No. 8.84.1. But the majority's reliance on defense counsel's closing argument is unfounded, because the trial court's instructions deprived counsel of the necessary tools with which to defeat the prosecutor's erroneous claim that the jury should disregard defendant's mitigating evidence. Although defense counsel told the jury it was legally entitled to consider the evidence of defendant's Christian conversion, he was unable to point to any language in former CALJIC No. 8.84.1 that would support this claim. Instead, he could only suggest that although the instruction was "awkwardly worded," it nevertheless was designed to include the evidence presented by the defense. A reasonable jury would not have been persuaded by this unconvincing, unsupported assertion.

### III.

As explained above, I find a "reasonable likelihood" (*Boyde, supra,* 494 U.S. at p. 380 [108 L.Ed.2d at p. 329]) that, based on the trial court's instructions and the prosecutor's misstatement of the law in his closing argument, the jury was misled into believing that it could not consider defendant's evidence in mitigation when it decided to impose the death penalty. The question then is whether the error was harmless. Because the error violated defendant's Eighth Amendment right to have the jury consider relevant mitigating evidence presented on his behalf, it was of federal constitutional dimension, and must be evaluated under the "beyond a reasonable doubt" test established in *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711-712, 87 S.Ct. 824, 24 A.L.R.3d 1965]. (*People* v. *Hamilton, supra,* 46 Cal.3d at p. 148.) I conclude that the error was prejudicial.

The jailhouse redemption evidence constituted defendant's entire case in mitigation. Eight witnesses testified on defendant's behalf, including a deputy sheriff at the jail who "would have had no particular reason to be

favorably predisposed toward one of [his] charges . . . ." (*Skipper* v. *South Carolina, supra,* 476 U.S. at p. 8 [90 L.Ed.2d at p. 9].) This evidence, if believed, might have persuaded the jury to spare defendant's life. Although the crimes defendant committed were heinous, they were not of such magnitude as to make a death verdict a foregone conclusion. (Compare *People* v. *Clark* (1992) 3 Cal.4th 41, 162-163 [10 Cal.Rptr.2d 554, 833 P.2d 561].)

In sum, I cannot say beyond a reasonable doubt that had the jury believed it could consider the mitigating evidence presented by defendant, it would nevertheless have imposed a sentence of death. Accordingly, although I would affirm the convictions and the special circumstance finding, I would reverse the judgment of death.

Mosk, J., concurred.

Appellant's petition for a rehearing was denied February 10, 1993. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.