William Charles PAYTON,
Petitioner–Appellee,

v.

Jeanne WOODFORD, Acting Warden of California State Prison at San Quentin, Respondent–Appellant.

William Charles Payton, Petitioner–Appellant,

v.

Jeanne Woodford, Acting Warden of California State Prison at San Quentin, Respondent–Appellee.

Nos. 00–99000, 00–99003.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 10, 2001

Filed Aug. 2, 2001

Nancy L. Palmieri, Deputy Attorney General, San Diego, California, for the respondent-appellant/cross-appellee.

Rosalie L. Rakoff, Santa Monica, California, for the petitioner-appellee/cross-appellant.

Dean R. Gits, Santa Monica, California, for the petitioner-appellee/cross-appellant.

Before: RYMER, HAWKINS, and RONALD M. GOULD, Circuit Judges.

Opinion by Judge RYMER; Partial Concurrence and Partial Dissent by Judge MICHAEL DALY HAWKINS

RYMER, Circuit Judge:

William Charles Payton was convicted in 1982 of the rape and murder of Pamela Montgomery, and the attempted murders of Patricia Pensinger and her ten-year-old

son, Blaine. He was sentenced to death. The California Supreme Court affirmed. *People v. Payton*, 3 Cal.4th 1050, 13 Cal. Rptr.2d 526, 839 P.2d 1035 (1992). It found that the prosecutor made an incorrect argument in the penalty phase about "factor (k),"[1]—that factor (k) does not refer to anything after the fact or later than the crime—but held that the error was harmless as it was not reasonably likely the jurors believed the law required them to disregard Payton's mitigating evidence. Payton filed a petition for habeas corpus in federal district court, which granted the writ on his claim of prosecutorial misconduct. The district court held that the penalty phase was rendered fundamentally unfair by the prosecutor's improper argument regarding the jury's consideration of mitigating evidence. Accordingly, the sentence of death was vacated until the state granted a new penalty trial and, if no retrial was held, Payton was to be sentenced to life imprisonment without the possibility of parole. His convictions for murder, rape, and attempted murder were left standing. The state appealed. We conclude that Payton's due process rights were not violated. It is not reasonably likely that the jury was misled into disregarding Payton's evidence because the prosecutor's incorrect statement was cured by the trial court's admonishment, the prosecutor's discussion of the substance of Payton's mitigating evidence, his concession that there was at least some merit to it, defense counsel's broad reading of factor (k), and the court's instruction that the jury "shall" consider "all" the evidence—which necessarily included Payton's evidence in mitigation.

Payton cross-appealed. He sought a certificate of probable cause (CPC) on January 14, 2000, which the district court granted on February 16. However, on April 26, the Supreme Court held in *Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs any habeas appeal commenced after AEDPA's effective date, April 24, 1996, without regard to when the petition was filed. Consequently, Payton needs a certificate of appealability (COA) rather than a CPC for this court to have jurisdiction. Because Payton could not have known that a COA rather than a CPC was required, "we treat the petitioner's notice of appeal as a request for a COA on the issues raised in the briefs, and we grant a COA on those issues as to which the petitioner has made the requisite 'substantial showing of the denial of a constitutional right.'" *Morris v. Woodford*, 229 F.3d 775, 779 (9th Cir.2000) (quoting *Schell v. Witek*, 218 F.3d 1017, 1021 n. 4 (9th Cir.2000)). We believe Payton has made such a showing and so grant a COA on the issues raised in his opening brief, but we agree with the district court on the merits that Payton's conviction must stand.

## I

Payton was a former boarder at Patricia Pensinger's home. Around 4:00 A.M. on May 26, 1980, he entered the house through the front door and went to the kitchen. Pensinger was in the kitchen, and Payton told her that he had car troubles. Pensinger offered Payton some beer and the two talked until about 4:50 A.M. Montgomery came to the kitchen to get a drink of water and Pensinger introduced the two, although Montgomery left the kitchen shortly afterwards.

Payton asked if he could sleep on the couch in the living room, and Pensinger

---

**1.** Factor (k) is the last of eleven mitigation factors and covers "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Cal.Penal Code § 190.3(k).

said okay. She then went to her bedroom, where Blaine was already asleep.

Pensinger was awaken by blows on her back. When she rolled over, Payton jumped on her and repeatedly stabbed her with a knife, primarily on her face and neck. The attack woke her son who was also stabbed when he tried to help his mother. Payton attempted to stab Pensinger in the abdomen but the knife would not penetrate because the blade had bent. Payton then left the bedroom yelling, "I'm leaving now."

Pensinger and her son tried to escape through the kitchen. But Payton was there. He grabbed another knife and began stabbing Pensinger and her son again, repeatedly. Eventually, others responded to the noise. Payton dropped the second knife and fled.

Both Patricia and Blaine Pensinger survived. In total, Patricia Pensinger suffered 40 stab wounds to her face, neck, back, and chest. Blaine Pensinger suffered 23 stab wounds to his face, neck, and back.

After the police arrived, Montgomery's body was discovered. Montgomery was found lying in a pool of blood on her bedroom floor, wearing only a nightgown that was open in the front. There was blood in the bedroom as well as a nearby bathroom. Underwear was found entwined in a pair of shorts in Montgomery's bed. Saliva and semen that was consistent with Payton's were found on the victim's breast and vaginal area. Montgomery had been stabbed 12 times; 6 of the stab wounds were in a line from Montgomery's stomach to her groin. She died approximately 15 to 30 minutes before she was found.

Payton arrived home at 6:15 A.M. His wife observed that his clothes, face, and hands were covered with blood (some of which was still wet). He had a cut on his index finger, and when he removed his clothes there was a "lot" of blood on his genital area as well as his legs and chest (but not on his pants). He also had fingernail scratches on his back. Payton fled, and was eventually arrested in Florida.

Payton was charged with the first degree murder, Cal.Penal Code § 187, and rape, Cal.Penal Code § 261(2), of Pamela Montgomery, and the attempted murders of Patricia Pensinger and Blaine Pensinger, Cal.Penal Code §§ 664 and 187. Trial counsel, James Merwin, was appointed on December 5, 1980. He and his investigator interviewed Payton's family (who basically painted the picture of an intelligent person raised in a middle-class background), and a couple of people who were at the party where Payton was before the murders (who indicated that he had been drinking and had apparently tried to assault two women sexually while there).

Merwin inherited the opinion of a mental health expert (Dr. Sheffner) retained by his predecessor that recounted Payton's past problems with sexual desires and concluded that Payton's claims of altered state of consciousness did not appear credible. Dr. Sheffner also opined that Payton's claims of amnesia or blackouts do not make medical sense or fit into any psychiatric-neurological pattern, that there was no evidence that Payton was in a psychotic state, and that his complaints of sleepwalking don't make sense. Merwin then retained Dr. E.W. Klatte, who interviewed Payton October 17, 1981 and reviewed several hundred pages of documentary material. Dr. Klatte discovered that Payton had consumed alcohol and drugs prior to the attack and had been looking for a woman to have "sexual relations" with. Payton admitted that some of the information he had given out to others was a lie, that he had problems dealing with women and sex, and sometimes worried that he was violent. He mentioned an incident

with a former girlfriend he had stabbed while she was sleeping. Payton also told Dr. Klatte that his parents were kind to him, spoiled him, spent considerable time with him, and did not mistreat him. Dr. Klatte's opinion was that Payton was intelligent, well-oriented, and without evidence of organic brain pathology; that he was not unconscious at the time of the incidents; and that his use of cocaine six weeks before would not have precipitated the violence. In sum, he did not lack substantial capacity to appreciate the criminality of his conduct. After receiving Dr. Klatte's report, Merwin sought the views of one other mental health expert, Dr. Edward Kaufman. He gave Dr. Kaufman the same documentary material and Dr. Klatte's evaluation. Dr. Kaufman did not interview Payton, but rendered an opinion that was consistent with Dr. Klatte's.

Meanwhile, in October or November of 1980, Payton told a fellow inmate, Alejandro Garcia, that he had raped and stabbed Montgomery because he had "this urge to kill." In the same time frame he also began talking about the attacks with Daniel Escalera, another inmate. Escalera was soon released but in late March, 1981 was re-incarcerated for violating probation. On April 3, Payton admitted to Escalera that he had a "severe problem" with women, that he wanted to "stab them and rape them," and that "all women on the street he seen was a potential victim, regardless of age or looks." Both Garcia and Escalera related what they had learned to the police. The prosecution disclosed their records (incomplete, as it turns out), and produced copies of their interviews. Merwin requested and obtained an evidentiary hearing pursuant to California Evidence Code § 402 to determine whether they were police agents, after which the trial judge found that neither was. Garcia testified in the guilt phase,

and Escalera testified at the penalty phase.

The prosecution's case consisted of the law enforcement officers who observed the crime scene; forensics experts who testified that saliva and semen samples taken from Montgomery's body were consistent with Payton's; Patricia and Blaine Pensinger, who offered first-hand accounts; Payton's wife, who testified that she saw blood on Payton's penis as well as fingernail scratches and digs on his legs and back; and Garcia, who testified that Payton had admitted to the crime.[2] The defense called no witnesses.

Payton was convicted by the jury in the Superior Court for Orange County on all counts. The jury found true the special circumstance that the murder occurred while Payton was engaged in the commission or attempted commission of rape. Cal.Penal Code § 190.2(a)(17)(iii). The jury also found true that Payton used a deadly weapon (a butcher knife). Cal.Penal Code § 12022(b).

At the penalty phase, Escalera testified regarding his jailhouse conversations with Payton. In addition, Patricia Stone, Payton's former girlfriend, testified that she had once been awakened with Payton holding a kitchen knife to her neck. He began stabbing her chest and arms. The defense presented eight witnesses, including Payton's pastor, a deputy sheriff, four inmates, his mother, and the director of a religious organization that ministered to prisoners. They testified that Payton had made a sincere commitment to God, had a calming effect on other prisoners, and could help others while in prison through Bible study classes and a prison ministry.

During closing argument, both the prosecutor and Merwin discussed factor (k), one of the eleven mitigation factors jurors

---

**2.** A friend of Montgomery also testified for the prosecution.

are to consider. Factor (k) permits consideration of "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." The trial court had rejected Merwin's request to modify the standard California jury instruction that described factor (k) in the language of the statute,[3] so that it would instead refer specifically to "evidence of the defendant's character, background, history, mental condition and physical condition." Nevertheless, the judge indicated that counsel could argue the point. The prosecutor stated that "this doesn't refer to anything after the fact or later" and that he did not think that evidence of religion put on by Payton was "really applicable" or "comes in under any of the eleven factors." Merwin moved for a mistrial, which was denied. The judge

admonished the jury that arguments of counsel are not evidence, and instructed the jury to consider all of the evidence. Merwin's closing argued that factor (k) was a catch-all that was designed to include the kind of evidence that Payton presented. Payton was sentenced to death.

Payton appealed, and filed a petition for habeas corpus in the California Supreme Court.[4] After neither succeeded, he sought a writ of certiorari in the United States Supreme Court, which was denied. *Payton v. California,* 510 U.S. 1040, 114 S.Ct. 682, 126 L.Ed.2d 649 (1994). On May 4, 1996, Payton filed a petition for writ of habeas corpus in the district court. The court granted Payton's request for investigative funds, but on August 2, 1996 ruled that certain issues had not been ex-

3. California Jury Instructions, Criminal 8.84.1 (4th ed. 1979) (CALJIC). The instruction provides:

In determining which penalty is to be imposed on [each] defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, [except as you may be hereafter instructed]. You shall consider, take into account and be guided by the following factors, if applicable:

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance[s] found to be true.

(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.

(c) The presence or absence of any prior felony conviction.

(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a mor-

al justification or extenuation for his conduct.

(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another.

(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the affects of intoxication.

(i) The age of the defendant at the time of the crime.

(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

4. The California Supreme Court appointed a referee to hold an evidentiary hearing to consider Payton's habeas claim that a psychological defense based upon his combat experiences in Vietnam should have been presented at trial. The referee found that Payton's claims of combat experience were false.

hausted. It stayed further federal proceedings to allow Payton to exhaust. After exhausting these claims, Payton filed an Amended Petition (at issue here) on January 30, 1998. The court rejected Payton's request for additional funds on July 7, 1998, and again on January 14, 1999.

The state moved for summary judgment, which the court granted as to all claims but claim IV(B)(3), the factor (k) error, on which it granted the petition on June 1, 1999. Both parties filed motions to alter or amend the findings, which the court denied. The court issued a final order December 17, 1999 resolving all remaining issues. The state appeals and Payton cross-appeals.

### The State's Appeal

### II

■ California asks us to reinstate Payton's death sentence for two reasons: first, the district court applied AEDPA incorrectly by refusing to give deference to the California Supreme Court ruling that the factor (k) error was harmless; and second, the record supports the California Supreme Court's ruling that the erroneous factor (k) argument was harmless. As for the first point, the state recognizes that our decision in *Calderon v. United States Dist. Ct. ("Kelly")*, 163 F.3d 530, 540 (9th Cir.1998) (en banc) (holding that a petition for the appointment of counsel to prepare and file a habeas petition, coupled with a motion for a stay of execution, initiates the case), controls because Payton initiated his case before (although he filed his petition after) AEDPA's effective date. The state would like to see *Kelly* revisited, but this, of course, this panel cannot do. Accordingly, our review of Payton's petition is governed by pre-AEDPA standards.

■ Pre–AEDPA, Congress directed us that state court determinations of histori-

cal fact "shall be presumed to be correct." 28 U.S.C. § 2254(d) (West 1994). However, "[t]he application of a legal standard to historical facts does not constitute a factual finding entitled to a presumption of correctness under section 2254(d)." *Thompson v. Borg*, 74 F.3d 1571, 1573 (9th Cir.1996) (quoting *Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir.1987)).

■ To establish prosecutorial misconduct, a petitioner must demonstrate that the prosecutor's closing "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "Improper argument does not, per se, violate a defendant's constitutional rights." *Thompson*, 74 F.3d at 1576 (quoting *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir.1993)). If prosecutorial misconduct is established, and it was constitutional error, we then apply the *Brecht*[5] harmless error test. *See Thompson*, 74 F.3d at 1577 ("Only if the argument were constitutional error would we have to decide whether the constitutional error was harmless.").

The state contends that the California Supreme Court got it right and the district court got it wrong because proper application of *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), in which the United States Supreme Court upheld the same CALJIC instruction on factor (k) that was used in this case, demonstrates that Payton was not deprived of his right to due process. In any event, the state submits, the prosecutor's erroneous statements were harmless.

Payton distinguishes *Boyde* by noting that unlike *Boyde*, no evidence was pre-

---

**5.** *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

sented by the defense at the guilt phase in Payton's case; each of Payton's witnesses in the penalty phase testified only with respect to his post-arrest conduct whereas in *Boyde,* they testified to pre-arrest conduct; and the only indication in *Boyde* that the jury may have been precluded from considering relevant mitigating evidence was the ambiguous factor (k) instruction, while in Payton's case the prosecutor asserted that factor (k) was intended to refer only to events which extenuated the crime itself, not to events that occurred after its commission. Payton argues that this damage to his case was exacerbated by other instructions of the trial court that the jury could consider "all of the evidence which has been received during any part of this case, except as you may be hereafter instructed"; and that the jury "shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed" after "having heard and considered the argument of counsel." In Payton's view, this gives rise to a "reasonable likelihood" that the jury was misled into believing that it could not consider his evidence in mitigation, *Boyde,* 494 U.S. at 380, 110 S.Ct. 1190, as well as extreme prejudice, because this was his only evidence in mitigation of the death penalty.

*Boyde* upheld the factor (k) instruction given in that case, and this one, against a challenge that it violated the Eighth Amendment by effectively precluding consideration of non-crime-related factors.[6] The Court concluded that there was no reasonable likelihood that jurors interpreted the instruction to prevent consideration of background and character mitigating evidence. As it explained:

> Petitioner had an opportunity through factor (k) to argue that his background and character "extenuated" or "excused" the seriousness of the crime, and we see no reason to believe that reasonable jurors would resist the view, "long held by society," that in an appropriate case such evidence would counsel imposition of a sentence less than death. The instruction did not, as petitioner seems to suggest, limit the jury's consideration to "any other circumstance *of the crime* which extenuates the gravity of the crime." The jury was directed to consider *any other circumstance* that might excuse the crime, which certainly includes a defendant's background and character.

*Id.* at 382, 110 S.Ct. 1190 (emphasis in original). Of course, the problem in Payton's case is somewhat different because Payton's prosecutor argued to the jury that the religion evidence did not reduce the gravity of the crime as it happened later. The Court noted that the prosecutor in *Boyde* had not argued that Boyde's background and character evidence was irrelevant or should not be considered. *Id.*

---

**6.** The instruction (CALJIC 8.84.1) states:

> In determining which penalty is to be imposed on [each] defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, [except as you may be hereafter instructed]. You shall consider, take into account and be guided by the following factors, if applicable:
>
> . . . . .
>
> (k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

CALJIC 8.84.1 has since been amended. 1 California Jury Instructions, Criminal 8.85(k) (5th ed.1988). *See People v. Easley,* 34 Cal.3d 858, 878, n. 10, 196 Cal.Rptr. 309, 322 n. 10, 671 P.2d 813 (1983) (indicating change should be made to avoid potential misunderstanding over meaning of factor (k)).

at 385, 110 S.Ct. 1190. However, Boyde also asserted that the prosecutor's arguments there—that Boyde's mitigating evidence did not suggest that his crime was less serious, and nothing the prosecutor had heard lessens the seriousness of the crime—reinforced an impermissible interpretation of factor (k), and what the Court said in addressing this contention is also instructive here:

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made.

*Id.* at 384–85, 110 S.Ct. 1190 (internal citations omitted).

■ In this case, there is no question that the prosecutor misstated what factor (k) refers to. He argued that "any other circumstance which extenuates or lessens the gravity of the crime ... doesn't refer to anything after the fact or later. That's particularly important here because the only defense evidence you have heard has been about this new born Christianity." This was incorrect, as the California Supreme Court held.[7]

■ The question is whether this incorrect argument so infected the penalty phase with unfairness that the resulting sentence denied Payton due process. We do not think so. We examine Payton's claim mindful of the presumption that jurors follow a court's instruction. *See Weeks v. Angelone,* 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000) ("A jury is presumed to follow its instructions."). As *Boyde* counsels, prosecutors' comments lack the force of jury instructions, and we cannot say that reasonable jurors in Payton's case were likely to conclude from the prosecutor's statements, in context of the arguments as a whole together with the court's instructions, that they could not

7. The dissent relies on what it states that the California Attorney General's office "conceded" in argument to the United States Supreme Court in *Boyde*—that "the prosecutor in *Payton* had 'misled the jurors.'" Dis. op. at 929. Whether or not this would matter if it happened (the question here is prejudicial error, not error), the state in fact made no such concession. What happened was that during a discussion about whether reasonable people could misinterpret the language of the factor (k) instruction that the Court ultimately approved, a justice remarked that "[a]t least one prosecutor, you would agree, has read it the way your opponent says the jury might read it." The following colloquy then occurred:

> MR. MILLAR: I would say that he misled the jurors in those case [sic], as far as what the face of that—
>
> QUESTION: But don't you suppose he did so because that is the way he read the instruction?
>
> MR. MILLAR: Well, I think we are speculating as far as what particular prosecutors did in particular—

Trans. Oral Argument, Nov. 28, 1989, *Boyde,* 1989 U.S. TRANS LEXIS 124, *26, *28–*29. It is impossible to tell from the transcript whether the exchange even referred to *Payton.* In sum, as the California Supreme Court said, "[w]e have examined the transcript of the oral argument in *Boyde,* and find nothing in it relevant to the proper resolution of *this* case." *Payton,* 3 Cal.4th at 1073, 13 Cal. Rptr.2d at 541, 839 P.2d 1035.

consider Payton's mitigating evidence at all.

The prosecutor began his closing argument by reading the entire instruction on the eleven mitigating factors that the jury was to be given, then stating: "I'm going to go over them, some of these are applicable and some of them are not, depending on your findings." R.T. 2117. When he got to factor (k) and incorrectly stated that "[i]t doesn't refer to anything after the fact or later," Merwin moved for a mistrial. The court admonished the jury that comments of counsel are not evidence and that "this is argument. And it's to be placed in its proper perspective." The prosecutor went back to factor (k), arguing that the problem with Payton's new Christianity is that "that evidence is well after the act of the crime and cannot seem to me in any way to logically lessen the gravity of the offense that the defendant has committed.... What I am getting at, you have not heard during the past few days any legal evidence mitigation [sic]. What you've heard is just some jailhouse evidence to win your sympathy, and that's all." Then he reviewed the aggravating evidence, and concluded by turning to religion. He prefaced this discussion with the remark that he did not "really want to spend too much time on it because I don't think it's really applicable and I don't think it comes under any of the eleven factors." He argued that religion can't whitewash the past, that the jury should not be impressed with Payton's writings about what he felt while he was a fugitive in Florida, that Payton got religion after he was in custody, and that he did not give mercy to Montgomery. Summing up how the factors should line up, the prosecutor said: "You haven't heard anything to mitigate what he's done. If you wanted to distribute a thousand points over the factors, 900 would have to go to what he did to Mrs. Montgomery, and I really doubt if

Mr. Merwin would dispute that breakdown of the facts."

Merwin's argument noted that he disagreed with the prosecutor about the applicability of factor (k). He told the jury that "you first have to look at the factor that's being discussed and decide in your own mind whether that factor is applicable to the facts of our case." Like the prosecutor, he argued whether the various factors were applicable or not. When he got to factor (k), Merwin indicated that this was one where "we disagree rather strenuously." He stated: "Mr. Jacobs tells you that's not applicable. If that's not applicable and that therefore all the evidence we presented is not applicable, why didn't we hear any objections to its relevance?" The prosecutor objected and the court said it was not going to repeat the admonition. Merwin continued:

The whole purpose for the second phase of trial is to decide the proper punishment to be imposed. Everything that was presented by the defense relates directly to that.

This section "k" may be awkwardly worded, but it does not preclude or exclude the kind of evidence that was presented. It's a catch-all phrase. It was designed to include, not exclude, that kind of evidence.

Any jury that wanted—that was in the position of trying to determine the fairest possible sentences, select them between death or life without possibility of parole, would not only want that kind of evidence but would need it to make an intelligent decision.

I submit the facts of this case, and this would not always be true, that that is the most critical of the factors, not only is it not irrelevant, it's the most critical of all the factors and I want to

go through some of the reasons for that with you now.

R.T. at 2150–51.

The court's final instructions directed the jury:

> In determining the penalty to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial in this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if applicable:
>
> . . . . .
>
> (k), Any other circumstance which extenuates the gravity of the crime even though not a legal excuse for the crime.

In context, the prosecutor's incorrect statement was ameliorated by the court's admonishment, his discussion of Payton's mitigating evidence, his concession that at least some points would go to it, defense counsel's broad reading of factor (k), and the court's instructions that the jury "shall" consider "all" the evidence—which necessarily included Payton's evidence of religious conversion.

Set against this, we are not persuaded that the court left it to the prosecutor to instruct on the law, or that the court and the prosecutor between them left it to the jury to determine the law. The entire mitigating evidence instruction is the same as the entire mitigating evidence instruction that the Supreme Court considered in *Boyde.* See 494 U.S. at 373, n. 1, 110 S.Ct. 1190 (quoting instruction in full). We cannot believe that when the trial court instructed the jury to consider *all* the evidence "except as you may be hereafter instructed," the phrase "except as you may be hereafter instructed" matters, constitutionally or otherwise, because nothing that was thereafter instructed told the jury that any evidence received during the trial, guilt phase or penalty phase, was excluded from their consideration. All of it was on the table. The defense evidence at the penalty phase focused entirely on evidence of Payton's religious conversion. Both the prosecutor and defense counsel argued its value. Both treated the applicability of the mitigating factors, including factor (k), as depending upon what the jury found convincing in the evidence. Each expressed a different view. Further, the court's initial instructions, which were again given to the jury at the penalty phase, made clear that it is the *court* that instructs on the law.[8] The prosecutor never suggested otherwise.

In these circumstances, we think it unlikely that reasonable jurors would believe the prosecutor's incorrect statement "transformed all of this 'favorable testimony into a virtual charade.'" *Boyde,* 494 U.S. at 383, 110 S.Ct. 1190 (quoting *California v. Brown,* 479 U.S. 538, 542, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987)). To do so they would have had to ignore the whole of the penalty phase, the court's instruction to put the prosecutor's argument in perspective and to consider all the evidence, and the attention given by both parties in argument to Payton's religious conversion. We presume that jurors follow the court's instructions,[9] and we cannot believe that they would have refused to *consider* Payton's penalty phase evidence simply because the prosecutor stated that, to him, factor (k) didn't mean something that happened after the fact.

---

8. The trial court instructed:

 Your … duty is to apply the rules of law that I state to you to the facts as you determine them and in this way to arrive at your verdict.

 It is my duty in these instructions to explain to you the rules of law that apply to this case. You must accept and follow the rules of law as I state them to you.

9. *See Weeks,* 528 U.S. at 234, 120 S.Ct. 727.

This being so, we cannot conclude that the penalty phase of Payton's trial was infected with such unfairness as to render his sentence a denial of due process. *See Drayden v. White*, 232 F.3d 704, 713 (9th Cir.2000); *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir.1995). We therefore vacate the writ.

### Payton's Cross-appeal

Payton's cross-appeal raises three overarching issues: whether his counsel rendered ineffective representation, whether the prosecutor's conduct denied Payton due process, and whether the district court erred in refusing to grant him additional funds to develop his mental defense, to investigate the background of both informants, and to pursue the prosecutor's failure to disclose their background to the defense. None requires the petition to be granted.

### III

Payton argues that Merwin conducted an incompetent investigation into Payton's mental state in the guilt phase by failing to investigate his conduct on the night of the murder; failing to investigate his personal and family background sufficient to develop information for a competent evaluation; and failing to obtain a forensic evaluation. He also claims that Merwin was ineffective in failing to seek appropriate discovery from the prosecution; failing to investigate the background of the informants; focusing the jury panel on a psychiatric defense that was never presented; and failing adequately to consult with Payton. Individu-

ally and cumulatively, he submits, these errors invalidate his conviction.

The standards are well established. To prevail under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Payton must show that his "counsel's performance was deficient" *and* "that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. Counsel's performance is measured "as of the time of counsel's conduct," *id.* at 690, 104 S.Ct. 2052, and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"[10] *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Because Payton must prove both deficient performance and prejudice, we "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Id.* at 697, 104 S.Ct. 2052.

Payton must "affirmatively prove prejudice." *Id.* at 693, 104 S.Ct. 2052. This requires showing more than the possibility that he was prejudiced by counsel's errors; rather, he must demonstrate that the errors *actually* prejudiced him. *See id.* Under *Strickland*, actual prejudice occurs where "there is a reason-

---

**10.** As the Supreme Court emphasized in *Strickland:*

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable pro-

fessional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

466 U.S. at 690–91, 104 S.Ct. 2052.

able probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. Whether an error actually prejudiced a defendant is weighed against the "totality of evidence before the judge or jury." *Id.* at 695, 104 S.Ct. 2052. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696, 104 S.Ct. 2052.

■ Finally, Payton's "ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case." *Bragg v. Galaza,* 242 F.3d 1082, 1088 (9th Cir.2001) (quoting *Eggleston v. United States,* 798 F.2d 374, 376 (9th Cir.1986)). Here, the government's case was overwhelming. Payton was linked to the crimes by physical evidence and eye-witness testimony, and confessed to an urge to kill. We consider each of his claims in that light.

### A

■ The record demonstrates that Merwin conducted a reasonable investigation of Payton's behavior on the night of the attack. A defense investigator interviewed two potential witnesses, both of whom described Payton's drinking and two incidents of attempted sexual assault. Given these reports, reasonable counsel could presume that exculpatory evidence would not develop from further investigation. A defense counsel is not ineffective where he to fails to interview a witness when the witness's "account is otherwise fairly known...." *Bragg,* 242 F.3d at 1088 (quoting *Eggleston,* 798 F.2d at 376); *see also Strickland,* 466 U.S. at 691, 104

S.Ct. 2052 ("[W]hen the facts that support a certain potential line of defense are generally known to counsel ... the need for further investigation may be considerably diminished or eliminated altogether."). More to the point, Payton cannot identify any exculpatory evidence that was never discovered. In the absence of such evidence, there can be no prejudice. *See Bragg,* 242 F.3d at 1088–89 (petitioner failed to identify what information further investigation would have revealed and how it would have been relevant given the strength of the government's case).

■ Payton did submit new evidence indicating that his biological father was abusive during the first five years of his life, that he was ignored by his mother and step-father, that he may have had a learning disability as a child, that he suffered negative psychological consequences as a result of his service in Vietnam, and that he has a history of substance abuse. However, Merwin, the experts, and the investigator interviewed Payton and his family and nothing they were told at the time would have tipped them to pursue any of these matters further. Their investigation revealed that Payton was raised in a happy home, that he was intelligent (possibly even in the superior range), and that he had used or abused drugs but was not on or affected by drugs at the time of the attacks. They also reviewed Payton's service records, which showed that he served in a non-combat capacity in Vietnam for twenty-two days before being discharged on account of heroin use. As found at the state evidentiary hearing, Payton admitted that he had not in fact had any combat experiences and any evidence of post traumatic stress disorder would have been almost totally unbelievable. *See People v. Payton,* 3 Cal.4th at 1074–79, 13 Cal. Rptr.2d at 542–45, 839 P.2d 1035. Thus, although it is difficult to fault counsel's investigation,[11] we need not resolve the

---

11. *Cf. Seidel v. Merkle,* 146 F.3d 750, 755–56

(9th Cir.1998) (as amended) (despite signs of

issue because it is clear that Payton has not shown that the negative evaluations of any of his mental health experts would be different *because of* the family history that he now proffers. He has not, therefore, proved prejudice.

■ Payton's claim with respect to forensic evaluation centers on Merwin's delay in obtaining psychiatric evaluations and how he handled the reports, particularly his delivery of Dr. Klatte's evaluation to Dr. Kaufman. So far as delay is concerned, nothing suggests that Dr. Klatte's opinion would have been different had it been rendered earlier. Dr. Klatte specifically stated at the state habeas evidentiary hearing that he had enough information to form his opinion. Further, by then, Payton had already been evaluated by Dr. Sheffner with similar negative results. Likewise, there is no evidence that Dr. Kaufman's evaluation would have been different had it been handled differently. Payton claims that counsel should have had Dr. Kaufman interview Payton, although Dr. Kaufman himself did not say that an interview was necessary, and that counsel erred under California law by giving him Dr. Klatte's report.[12] But even putting Dr. Kaufman's opinion aside, two mental health experts came to nearly identical conclusions. There is no showing of any different opinion. For this reason it is unnecessary to decide whether counsel erred under California law in giving Dr. Kaufman Dr. Klatte's report, as Payton

contends. Payton was not prejudiced regardless.

### B

■ Payton asserts that he was prejudiced because Merwin failed to request or obtain a court order for discovery compliance. Had he done so, Payton maintains that he would have obtained information critical to the defense for both guilt and penalty phases on Alejandra Garcia, one of the informants who testified against him. He claims that the additional information would have shown prior instances when Garcia provided information to the government in exchange for guilty pleas, and facts establishing that Garcia targeted Payton as a source of information to develop for the benefit of law enforcement. Assuming counsel should have followed-up on the prosecution's voluntary disclosures, we nevertheless see no reasonable probability that the results would have been different.

None of the evidence that Payton adduced suggests that Garcia was acting as a government agent or otherwise elicited the confession in violation of *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Payton conceded as much at oral argument.

Nor would further impeachment have any reasonable probability of producing a different outcome. Garcia in fact had three more convictions than the seven Merwin knew about, but they would simply have been cumulative.[13] Garcia admitted

---

mental illness trial counsel failed to conduct any investigation *at all* into defendant's psychiatric history); *see Hendricks v. Calderon,* 70 F.3d 1032, 1037–39 (9th Cir.1995) (counsel not ineffective for relying on psychiatric evaluations rather than independently investigating defendant's personal and family history).

12. *See People v. Coddington,* 23 Cal.4th 529, 603–06, 97 Cal.Rptr.2d 528, 593–96, 2 P.3d 1081 (2000) (disclosure of non-testifying ex-

perts who examined defendant protected by work product privilege).

13. *See United States v. Marashi,* 913 F.2d 724, 732 (9th Cir.1990) (holding no *Brady* error occurs "when the evidence would not have affected the jury's assessment of the witness' credibility and when the witness was subjected to vigorous cross-examination.") (quoting *United States v. Endicott,* 869 F.2d 452, 456 (9th Cir.1989)).

at trial that he had been convicted of felony forgery in 1959, burglary in 1971, grand theft in 1975, and a burglary the previous September. He also testified that he had recently "cleared paper" on over 300 burglaries in exchange for probation on his most recent burglary charge. Garcia stated that he had no charges pending against him, and that he was not offered, and was not receiving, anything for his testimony. Nothing suggests otherwise. Payton's discovery that Garcia had testified as an informant in 1976 does not undermine our confidence in the result, because there is no evidence that he sought or received any consideration for his testimony in that case except for an undertaking to try to arrange out-of-state incarceration for his safety. Similarly, the fact that Garcia was permitted to serve time for his latest burglary conviction at the Anaheim City Jail instead of state prison after he "cleared paper" does not show that he had charges pending for which he expected any consideration. Payton's claim that Garcia committed perjury when he testified that his probation was revoked for failing to report, whereas it was actually revoked for a positive drug test, lacks merit; it is unclear whether his probation was revoked for one, the other, or both. Consequently, we see no prejudice.

### C

■ Payton argues that Merwin's voir dire inquiries about prospective jurors' attitude toward presentation of psychiatric evidence, and disclosure of the identity of potential experts who might be called as witnesses, was prejudicial as it led the jury to expect that defense psychiatric evidence would be forthcoming. Merwin explained at his deposition that he

believed a juror's views on psychiatric evidence gave insight into their beliefs on life and reasonable doubt, as well as their ability to weigh aggravating and mitigating factors. This was a tactical decision that we decline to second guess. In any event, Payton has shown no actual prejudice because he only speculates as to the effect this line of questioning had on the jury.[14]

### D

■ Payton claims that during the year between his appointment and commencement of trial, Merwin only conferred with him for 8.1 hours, but he points to nothing that would have happened differently had Merwin and he spent more time together. Absent this, there is no reasonable probability that the results of the proceeding would have been different.

### E

■ Payton contends that the prosecutor committed misconduct during the guilt phase by failing to disclose Brady[15] material which could have further impeached Garcia and made it likely that the superior court would have rendered a more favorable ruling on the admissibility of Garcia's testimony. To prove a Brady violation, Payton must show that: "(1) the evidence was exculpatory or impeaching; (2) it should have been, but was not produced; and (3) the suppressed evidence was material to his guilt or punishment." Paradis v. Arave, 130 F.3d 385, 392 (9th Cir.1997). Impeachment evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v.

---

14. See Wade v. Calderon, 29 F.3d 1312, 1318 (9th Cir.1994) (petitioner suffered no prejudice on account of counsel's failure to examine jurors during voir dire concerning diminished capacity and insanity defenses where defense later relied upon those theories).

15. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). For reasons we have already explained, we do not believe that the additional, undisclosed information was material, as it would not have undermined Garcia's credibility any more than his credibility was already undermined by testimony about his · prior convictions and "clearing paper" on approximately 300 burglaries in exchange for probation on his most recent charge. Neither can we say that it would have changed the result of the state court hearing; there is no suggestion that Garcia had any promise of leniency or other consideration for testifying in Payton's case.

### F

Payton's claim of prejudicial, cumulative error turns on the absence of adequate preparation of a mental defense. However, Merwin investigated Payton's conduct during the night of the crime, family background, and mental health, and Payton has not demonstrated that *any* mental health expert would diagnosis him differently from Dr. Sheffner, Dr. Klatte, and Dr. Kaufman. Consequently, no error occurred on these claims. Nor do we see any error during voir dire. Payton's claim of ineffective assistance of counsel for Merwin's failure to investigate Garcia and his claim of prosecutorial misconduct for the prosecutor's failure to disclose evidence about Garcia are opposite sides of the same coin. Thus, cumulatively, these claims cause no more prejudice than they do independently.

### IV

 Payton's penalty phase arguments all focus on claims of ineffective assistance of counsel. The *Strickland* analysis is the same with respect to the penalty phase as it is with the guilt phase. "When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052.

### A

 Payton contends that Merwin failed to examine prospective jurors properly about their attitudes toward the death penalty, reflecting his (improper) belief that a juror was to engage in a mechanical tallying of aggravating and mitigating factors; failed to object to the prosecutor's advice that if the aggravating factors outweigh the mitigation, the jury should vote for the death penalty; and improperly failed to articulate that the determination must be resolved by each individual juror. Regardless, the trial court correctly instructed the jury at the penalty phase on its duties in arriving at an appropriate punishment, *see Boyde,* 494 U.S. at 377, 110 S.Ct. 1190, and we presume that the jury followed the instructions. *See Weeks,* 528 U.S. at 234, 120 S.Ct. 727.

### B

 Payton argues that his counsel was ineffective for failing to investigate the background of jailhouse informant, Daniel Escalera, who testified during the penalty phase, to determine his credibility or history as a government agent. Payton first contends that had Merwin read the transcript of Escalera's statements to investigators, he would have known that he was a government agent. The tape does not show this, although arguably it should have spurred further inquiry. Post-conviction, Payton uncovered evidence of Escal-

era's numerous arrests, work for the Drug Enforcement Agency, and testimony as an informant. Still, nothing shows that Escalera was planted as a government agent to elicit incriminating information from Payton, thereby violating his *Massiah* rights. As with Garcia, Payton acknowledged at argument that there was no reasonable likelihood that Escalera would not have been allowed to testify even if his post-conviction discoveries had been known at the time.[16]

█ Second, he asserts that a reasonable investigation would have discovered substantial evidence that could have further impeached Escalera at trial. However, Escalera's prior convictions came out on both direct-examination and cross-examination, as did his recent guilty plea to a felony robbery charge in exchange for a potential prison sentence of one to seven years; Escalera also admitted that he hoped for leniency for testifying against Payton. Thus, the jury was aware that Escalera had a motive for giving testimony. In that context, further information about his background as a confidential informant in unrelated drug cases, and leniency received in return for testimony in those cases, would unlikely have swayed the jury.

## C

█ Payton contends that Merwin rendered constitutionally ineffective assistance in failing to investigate timely and adequately, and to present evidence about, his personal, family, and mental background during the penalty phase of the trial. "It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase." *Smith v. Stewart*, 241 F.3d 1191, 1198 (9th Cir.2001) (quoting *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir.), *cert. denied*, 527 U.S. 1049, 119 S.Ct. 2414, 144 L.Ed.2d 811 (1999)). "Failure to present mitigating evidence at the penalty phase of a capital case constitutes ineffective assistance of counsel." *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir.1998). Here, of course, mitigating evidence was presented and, as we have discussed, Merwin did investigate Payton's personal and family background. Payton points to post-conviction declarations by siblings which show that he may have suffered abuse from his biological father during his first five years, but the evidence is inconclusive at best. Two of the three are unsure whether Payton was abused, and the other provides no details. Even so, the record shows the first five years were followed by a normal and supportive environment.

█ Nor was counsel deficient for failing to present evidence of mental defect. Such evidence did not exist then, and does not exist now. Merwin consulted with mental health experts, but their opinions were aggravating rather than mitigating. Although Payton contends that the experts lacked the information or time to diagnose him properly, he has proffered no medical opinion to undermine our confidence in those evaluations. In short, there is no basis for finding prejudicial error.

Finally, the state's case of aggravation was overwhelming. The crimes were vicious and Payton had committed a similar attack in the past. Thus, even if Payton's speculative mitigation evidence were

---

**16.** *See People v. Pensinger*, 52 Cal.3d 1210, 1249–50, 278 Cal.Rptr. 640, 658–59, 805 P.2d 899 (1991) (holding that an informant, who had a prior history of being an informant, was not a government agent where the informant initiated discussions with the police; the police did not ask for the informant to take any action or to "keep his ears open"; the police did not offer leniency; the police did not know that the witness had previously been an informant; the police told the informant he was not their agent; and the prosecutor testified on the informant's behalf at his trial).

thrown into the balance, there is no reasonable probability that the outcome would have been different. *See Bonin v. Calderon*, 59 F.3d 815, 836 (9th Cir.1995) ("[I]n cases … where the aggravating circumstances are overwhelming, it is particularly difficult to show prejudice at sentencing due to the alleged failure to present mitigation evidence.").

### D

■■■ Payton maintains that Merwin failed to develop and present evidence of post-traumatic stress disorder (PTSD) resulting from his service in the Vietnam War, but offers nothing substantial in support. In any event, Payton cannot demonstrate that Merwin was deficient for failing to investigate a defense that did not exist until *after* Payton lied about his combat experience. Further, the record indicates that Merwin did investigate Payton's service in Vietnam (and found no "red flags" which warranted further investigation), and that he disclosed Payton's service record to the psychiatrists who examined him, none of whom diagnosed him with PTSD. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir.1999) (holding that counsel cannot be faulted for failing to pursue a mental state defense when such a defense seems unlikely); *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir.1998) (as amended) (holding that counsel had no obligation to seek out specific PTSD experts rather than the experts counsel actually retained).

### E

■■■ Payton contends that Merwin should have objected when the prosecutor argued to the jury about his mitigation evidence, "What you've heard is just some jailhouse evidence to win your sympathy, and that's all." He relies on *California v. Brown*, 479 U.S. 538, 542–43, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), and *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), but neither is apposite

because Merwin's failure to object did not tacitly concede that the jury could not consider sympathy.

### F

Finally, Payton argues that his sentence must be overturned because of cumulative error. Even when we consider all of Payton's claims cumulatively, we do not see errors that "had substantial and injurious effect or influence in determining the jury's verdict" because the jury would have reached the same conclusion anyway. *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

### V

■■■ Payton asks us to reverse the district court's determination that he was not entitled to additional funds to complete his psychiatric evaluations in order to demonstrate prejudice resulting from trial counsel's failure adequately to pursue a mental defense. We review the denial of investigative funds for an abuse of discretion. *See Bonin*, 59 F.3d at 837. We have thoroughly examined the record and documents that Payton has filed under seal, and conclude that the district court did not err. Payton was entitled to "reasonably necessary," not unlimited, funds. *See id.* The record and sealed documents indicate that Payton has had ample opportunity and funding to complete necessary mental health evaluations. He received three mental health examinations in preparation for trial, and substantial investigation into his claimed PTSD which only arose after he lied about his Vietnam War service record. Payton's inability to produce evidence supporting his petition is not indicative of his lack of funding; rather, it demonstrates the lack of merit to his claims.

*Conclusion*

We disagree with the district court's conclusion that the prosecutor's closing argument rendered Payton's penalty trial fundamentally unfair. We agree that Payton has failed to demonstrate any basis for habeas relief on his guilt phase claims or remaining penalty phase claims. Accordingly, we reverse the judgment entered on Claim IVB, item 3 of the Petition for Writ of Habeas Corpus and order the writ vacated. Otherwise, we affirm.

AFFIRMED IN PART; REVERSED, VACATED AND REMANDED IN PART.

HAWKINS, Circuit Judge, concurring in part and dissenting in part:

Because I agree with the district court that Payton was deprived of his due process rights in the penalty phase of his trial, I respectfully dissent from Section II of the opinion.[1]

This is a case of compound error involving a serious and repeated misrepresentation of law by the prosecutor. The initial error occurred when the prosecutor was permitted, in effect, to instruct the jury that it could not legally consider Payton's mitigating evidence—evidence that the California appellate courts acknowledge was completely admissible. Bad enough that this should happen, but in a nearly complete abdication of its responsibility to properly explain the law to the jury, the state trial court not only failed to correct the misinformation, it permitted the prose-

cutor to argue his own interpretation of a sentencing factor as if it were the law. Because the prosecutor's "instructions" told the jury it must ignore the only mitigation evidence that Payton offered, the decision whether to consider it made the difference, quite literally, between life and death. All this was done without ever correctly instructing the jurors that the evidence was fully admissible and that they were required to consider it. The result of this deadly combination of prosecutorial misleading and judicial abdication "fundamentally affected the fairness" of the penalty phase of Payton's murder trial and violated his due process rights. *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). The district court was quite right to determine that the proper remedy was to order the state to conduct a new penalty phase hearing for Payton or commute his death sentence to life without possibility of parole.

In its so-called "unadorned version," factor (k) instructed the members of the jury that they could consider: "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."[2] Although in a chambers conference the trial court agreed with Payton's counsel that factor (k) was a "wide open," "catch-all" provision, Payton's request for an instruction to make clear to the jury that his mitigating evidence should be considered was refused. Were this the end of the story, I might agree with the majority that Payton's case is

---

1. I concur in the result with respect to the guilt phase, the remaining penalty phase issues and the denial of additional investigative funds.

2. In *People v. Easley*, 34 Cal.3d 858, 196 Cal. Rptr. 309, 671 P.2d 813 (1983), the California Supreme Court recognized the potential for confusion over the meaning of factor (k). *Id.* at 826 & n. 10. The instruction was later changed to read "Any other circumstance

which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." *Boyde v. California*, 494 U.S. 370, 375 n. 2, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (quoting 1 California Jury Instructions, Criminal 8.85(k) (5th ed.1988)). Payton's trial occurred prior to the decision in *Easley*.

quite similar to *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), which addressed the constitutionality of former CALJIC 8.84.1.

Unlike the prosecutor in *Boyde*, however, who " 'never suggested that the [defendant's] background and character evidence could not be considered,' " *id.* at 384, 110 S.Ct. 1190 (quoting *People v. Boyde*, 46 Cal.3d 212, 250 Cal.Rptr. 83, 758 P.2d 25, 47 (1988)), the prosecutor in Payton's case, armed with the authorization of the trial court, told the jury it could not legally consider Payton's only mitigation evidence, the evidence of his religious conversion. First, the prosecutor argued that factor (k) referred only to:

> some factor at the time of the offense that somehow operates to reduce the gravity for what the defendant did. *It doesn't refer to anything after the fact or later. That's particularly important here because the only defense evidence you have heard has been about this new born Christianity.* (Emphasis added).

Although Payton's counsel objected to this argument as inconsistent with the agreement reached in chambers regarding factor (k), the judge decided to let the attorneys "make that argument either way." The prosecutor then resumed his attack on the legality of Payton's mitigation evidence:

> The only defense evidence you've heard had to do with defendant's new Christianity and that he helped the module deputies in the jail while he was in custody. *The problem with that is that evidence is well after the fact of the crime and cannot seem to me in any way to logically lessen the gravity of the offense that the defendant has committed. . . . What I am getting at, you have not heard during the past few days any legal evidence [of] mitigation.* What you've heard is just some jailhouse evidence to win your sympathy, and that's

all. *You have not heard any evidence of mitigation in this trial.* (Emphasis added).

The prosecutor continued this theme throughout the closing, noting later on that "You've heard no evidence of any mitigating factors" and then, even later, addressing Payton's evidence but reiterating that "I don't think it's really applicable and I don't think it comes under any of the eleven factors."

The majority concedes that the prosecutor's argument was improper but argues that it did not so infect the penalty phase with unfairness as to deprive Payton of due process. First, the majority argues that the impact of the prosecutor's initial statement was diluted by a "curative" instruction from the judge. Once the prosecutor began suggesting that Payton's mitigation evidence was inapplicable, Payton's attorney immediately objected. The judge overruled this objection, however, and indicated he was going to let each side "argue it." He then simply commented to the jury that "the comments by both the prosecution and the defense are not evidence. You've heard the evidence and, as I said, this is argument." With that, the judge permitted the prosecutor to continue to admonish the jurors that the California sentencing factors simply did not let them consider any mitigating evidence pertaining to events after the crime. It is difficult to determine how the court's limited intervention did anything to correct the error; if anything, it expressly permitted the error to be repeated.

Next, the majority argues that the prosecution discussed the defense's evidence in mitigation and "conceded" it had at least some merit. Again, I disagree. The prosecution put very little emphasis on the defendant's evidence and then did so without ever conceding it could or should be

considered.[3] His limited discussion of Payton's evidence also pales in comparison to the prosecutor's repeated arguments to the jury that it could not consider the only evidence in mitigation offered by Payton.

The majority also contends the prosecutor implicitly conceded the validity of Payton's defense when he said: "If you wanted to distribute a thousand points over the factors, 900 would have to go to what he did to Mrs. Montgomery." The majority reads this as conceding Payton's religious conversion evidence was worth at least 100 points. The more logical interpretation is that the prosecutor was telling the jury that 900 points would go to the rape/murder, with the other 100 points going to other aggravating factors, such as prior felonies. Whatever the interpretation, it is highly unlikely a jury would (1) view such an obtuse "concession" as undermining the prosecutor's explicit, repeated argument that the evidence could not be considered, or (2) disregard the prosecutor's caveat that even though he was discussing the religion evidence, he still did not believe it could be considered.

The majority also asserts the effect of the prosecutor's argument was blunted because the defense was permitted to argue for its own interpretation of factor (k). Although defense counsel told the jury it could consider Payton's evidence, he could point to no language in the statute or instruction that supported this claim. He instead was left with arguing that factor (k) was "awkwardly worded," but that it did not preclude consideration of the post-crime religious conversion. This is in stark contrast to the repeated argument of the prosecution, referring to the language in factor (k)—"extenuates or lessens the gravity of the crime"—to bolster the argument that the language of factor (k) refers only to some fact in operation at the time of the offense. *Cf. Penry v. Johnson,* 531 U.S. 1003, 121 S.Ct. 1910, 150 L.Ed.2d 9, (2001) (rejecting argument that defense counsel had sufficiently clarified application of jury instruction because prosecutor had "effectively neutralized defense counsel's argument" and "[a]t best, the jury received mixed signals").

The majority also relies on the "consider all the evidence" instruction given to the jury. More precisely, the jury was instructed to consider "all the evidence ... *except as you may be hereafter instructed.*" (emphasis added). The very next instruction the jurors heard was CALJIC 8.84.1 regarding aggravating and mitigating factors, including factor (k), which the prosecution had told them precluded consideration of Payton's evidence. The generic "consider all the evidence" instruction did nothing to undo the damage.

The majority relies heavily on *Boyde,* in which the Supreme Court determined that the context of the proceedings in that case would have led reasonable jurors to the proper interpretation of factor (k). 494 U.S. at 383, 110 S.Ct. 1190. However, *Boyde* is different in several significant respects. First, Boyde's mitigating evidence involved his background and character, pre-crime evidence which more readily fits within factor (k). Payton's only evidence was post-crime, a distinction the prosecutor brought home again and again. Second, Boyde presented "four days of testimony consuming over 400 pages of trial transcript," which led the Supreme Court to conclude a reasonable jury would not disregard such "volumes" of mitigating evidence without more specific direction.

---

3. Specifically, the few comments the prosecutor did make were prefaced as follows:

> I want to make a few comments about religion, the only evidence put on by the defendant. I don't really want to spend too much time on it because I don't think it's really applicable and I don't think it comes under any of the eleven factors....

*Id.* at 384, 110 S.Ct. 1190. The Supreme Court also noted, however, that "(p)resentation of mitigating evidence alone, of course, does not guarantee that a jury will feel entitled to consider that evidence." *Id.* In Payton's case, his mitigating evidence was much less voluminous—it was presented in one day and took only seventy-three pages of transcript.

Finally, and most importantly, the prosecutor in *Boyde* never suggested that the defendant's mitigation evidence could not be considered. *Id.* at 385, 110 S.Ct. 1190. The Supreme Court emphasized that the prosecutor's principal theme was not that Boyde's mitigation evidence could not be considered, but that it should be given minimal weight in light of the aggravating circumstances. *Id.* The exact opposite is the case here. In fact, in oral argument before the Supreme Court in *Boyde,* the California Attorney General discussed this very case and conceded that Payton's prosecutor had "misled the jurors." *See* Trans. Oral Argument, Nov. 28, 1989, *Boyde,* 1989 U.S. Trans. Lexis 124, *10–11, *26–28;[4] *see also Boyde,* 494 U.S. at 386 n. 6, 110 S.Ct. 1190 (noting that "prosecutors in other cases may have pressed a construction of factor (k) that would cause the sentencing proceedings to violate the Eighth Amendment" but that did not mean the jury in *Boyde* arrived at the same conclusion).

This is not a case where the prosecutor made an offhand remark during the course of trial. The prosecutor's erroneous argument was far from subtle. It was explicit, deliberate, consistent and repeated. Certainly, arguments of counsel generally carry less weight than instructions from the court. *Boyde,* 494 U.S. at 384, 110 S.Ct. 1190. But when the court expressly permits counsel to argue the legal meaning of an instruction, without ever instructing the jury which interpretation is correct, the arguments of counsel obviously take on significant importance. A lay jury is ill-equipped to determine which view of the law is correct. *See Griffin v. United States,* 502 U.S. 46, 59, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (if "jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think their own intelligence and expertise will save them from that error").

"The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered" by a defendant. *Boyde,* 494 U.S. at 377–78, 110 S.Ct. 1190. The prosecutor's argument in this case flies directly in the face of this constitutional requirement. The context of Payton's penalty phase as a whole did little, if anything, to mitigate the prosecutor's error. The district court correctly and properly determined that the prosecutor's argument so infected the penalty phase with unfairness that Payton was

---

**4.** Although the majority contends it is "impossible to tell from the transcript whether the exchange even referred to *Payton,*" I believe it is quite clear that it did if one reads the entire transcript. Boyde's counsel referenced an amicus brief containing examples of prosecutors misreading section (k), and then asked the Court to consider, specifically, "the case of *People versus Payton.*" 1989 U.S. Trans. Lexis 124, *10–11. During the State of California's argument, the Court asked counsel to address Boyde's argument concerning *Payton. Id.* at *26–27, 13 Cal.Rptr.2d 526, 839 P.2d

1035 ("Let me ask you about the prosecutor's argument *in the other case that your opponent referred to . . . .*") (emphasis added). It was in this context that the State said that the prosecutor in *Payton* had misled the jurors. *Id.* at *27–28, 13 Cal.Rptr.2d 526, 839 P.2d 1035. Moreover, in oral argument before this panel, the State admitted that the exchange occurred and involved *Payton,* but argued it was improper for the attorney to have made such a statement to the Court because the attorney was not sufficiently familiar with the record in *Payton* to have reached such a conclusion.

denied due process. *Darden*, 477 U.S. at 181, 106 S.Ct. 2464.

Was the error harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)? Under *Brecht*, an error is not harmless if it "had a substantial or injurious effect in determining the jury's verdict." *Id.* Quite frankly, if this error was harmless, it is difficult to imagine a sentencing phase error that would not be. The prosecutor told the jury it could not consider the only evidence of mitigation that Payton put forward. Without this evidence, the jury had no alternative but to reach a death verdict.[5]

Like many of the capital cases we review, Payton's crimes were certainly heinous. But that does not relieve us of the responsibility to ensure that the jury was properly advised and able to consider all properly admissible evidence. As we have previously explained:

> The determination of whether to impose a death sentence is not an ordinary legal determination which turns on the establishment of hard facts. The statutory factors give the jury broad latitude to consider amorphous human factors, in effect, to weigh the worth of one's life against his culpability. Presumably the imposition of a death sentence is entrusted to a jury because it is a uniquely moral decision. . . .

*Hendricks v. Calderon*, 70 F.3d 1032, 1044 (9th Cir.1995).

This is not a case where effective but fair argument convinced a jury that the evidence of aggravation outweighed the evidence in mitigation. The prosecutor here was permitted to erroneously tell the jury what it could and could not consider. The trial court's flippant comment to allow the parties to "argue it" abdicated its responsibility to tell the jurors that Payton's evidence in mitigation was fully admissible and that they were required to consider it. Under these circumstances, it is difficult to imagine how the prosecutor's arguments could not have had a substantial and injurious effect on the jury's verdict.

It is very difficult to have confidence in the outcome of a life and death decision made in these circumstances. The verdict might have been reached through an appropriate weighing of aggravating versus mitigating factors, but it seems much more likely to have been reached because the jury erroneously believed there were no mitigating factors it could legally consider. For the reasons stated, I would affirm the district court's decision to grant the petition as to the penalty phase of Payton's trial.

---

**5.** The jury was instructed "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you *shall* impose a sentence of death." (emphasis added).